**15192 THIRTEEN MILE ROAD, INC., Plaintiff,**

**v.**

**CITY OF WARREN, A Michigan Municipal Corporation, Defendant.**

**CHRISTY SALES AND SERVICE, INC., Plaintiff,**

**v.**

**CITY OF WARREN, A Michigan Municipal Corporation, George Bruggeman, Director of Building and Safety for the City of Warren, and Ted Bates in his capacity as Mayor of the City of Warren, jointly and severally, Defendants.**

**4061 EAST EIGHT MILE ROAD, INC., a Michigan Corporation, Plaintiff,**

**v.**

**CITY OF WARREN, a Michigan Corporation, Defendant.**

**15184 THIRTEEN MILE ROAD, INC., Plaintiff,**

**v.**

**CITY OF WARREN, Defendant.**

**DETROIT NOVELTY AND TOY, INC., A Michigan Corporation, Plaintiff,**

**v.**

**CITY OF WARREN and Michael S. Servitto, Jr., individually and in his official capacity as Director of Public Service Department, City of Warren, jointly and severally, Defendants.**

Civ. A. Nos. 83–CV–9030 PH, 81–CV–30053 PH, 83–CV–9071 PH, 83–CV–9078 PH and 84–CV–9798 PH.

United States District Court, E.D. Michigan, S.D.

Dec. 30, 1985.

Gregory Fisher Lord, Southfield, Mich., for Christy Sales.

James I. DéGrazia, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C., Detroit, Mich., Janice Hildenbrand, Ulanoff, Ross & Wesley, P.C., Southfield, Mich., for City of Warren, et al.

Stephen M. Taylor, Southfield, Mich., for all plaintiffs.

David Dalenberg, Warren, Mich., for City of Warren.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

The above-captioned cases each raise the same constitutional challenges to the validity of Warren Zoning Ordinance, Section 14.02(C) [hereinafter Ordinance 14.02(C)]. Having conducted two hearings for preliminary injunction and having taken testimony for nearly four weeks in this case on the merits, the Court hereby issues its Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

The plaintiffs in this case [1] filed suit under 42 U.S.C. § 1983 challenging the constitutionality of Warren Zoning Ordinance 14.02(C). Ordinance 14.02(C) regulates the ability of adult businesses to locate within

---

1. Inasmuch as the five above-captioned cases each raise the same constitutional challenges and the Court has ordered the cases consolidated for trial purposes, the Court will refer to these cases collectively and in the singular as "this case."

the City of Warren. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343(3).

## I. FINDINGS OF FACT

### A. *The City of Warren and Ordinance 14.02(C)*

The City of Warren, Michigan is located in Southeastern Michigan. Warren is a contiguous municipal neighbor of Detroit and is largely a residential community for families of moderate incomes. The City is 36 square miles in size [2] and is divided into 36 one square mile sections, the boundaries of which are defined by various major roads that traverse the City. Each section is comprised of approximately 5000 residents and each is intended to support an elementary school.

2. Warren is approximately one-eighth the size of Detroit.

3. The planning goals of the City are set out in *Direction for Warren,* a comprehensive development plan prepared by the Warren Planning and Urban Renewal Commission.

4. 14.02 APPROVAL OF SPECIAL LAND USE PERMIT.

Under such conditions as the City Council, after recommendation of the Planning Commission, finds the use meets the standards for approval set forth in Section 22.14 of the Ordinance and subject to the conditions that may be imposed, the following uses may be permitted:

C. Adult Businesses—including but not limited to the following: Adult bookstores, adult motion pictures, adult mini motion pictures, nude body painting or modeling studios, and escort services.

1. *Definitions*

a) *Adult Bookstore.*
An establishment having a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Special Anatomical Areas", (as defined below), or an establishment with a segment or section devoted to the sale or display of such material.

b) *Adult Motion Picture Theatre.*
An enclosed building with a capacity of 50 or more persons used for presenting material having a dominant theme materials distinguished or characterized by an emphasis on matter depicting, describing or relating to "Special Sexual Activities" or "Specified Ana-

Warren was incorporated in 1957 and has had a comprehensive zoning ordinance since 1960. Through its zoning ordinance, Warren has attempted to realize its planning goal of ordered future growth by regulating land use within the community.[3] The principal concern of Warren in regulating land use is the preservation of residential life. Accordingly, Warren has attempted to maintain the quality of life in its neighborhoods by locating incompatible land uses in a manner so as to minimize their impact on residential life.

As part of its comprehensive zoning plan, the City of Warren regulates the ability of adult businesses to locate within the City by virtue of Ordinance 14.02(C).[4] The ordinance requires: 1) that adult businesses be

tomical Areas", (as defined below), for observation by patrons therein.

c) *Adult Mini Motion Picture Theatre.*
An enclosed building with a capacity for less than 50 persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Activities" or "Specified Anatomical Areas", (as defined below), for observation by patrons therein.

d) *Nude Body Painting or Modeling Studio.*
An establishment which provides the services of body painting of the human body or (as defined below) are offered for observation of the patrons therein.

e) *Escort Services.*
An establishment which provides the services of escorting members of the opposite sex for payment of a fee.

f) *Specified Sexual Activities, Specified Anatomical Areas.*
For the purpose of this Section "Specified Sexual Activities" is defined as:
(1) Human genitals in a state of sexual stimulation or arousal.
(2) Acts of human masturbation, sexual intercourse or sodomy.
(3) Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.

And, "Specified Anatomical Areas" is defined as:
(1) Less than completely and opaquely covered;
(a) human genitals, pubic region,
(b) buttock, and
(c) female breast below a point immediately above the top of the areola; and
(2) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

located on a major thoroughfare, as designated in the Master Thoroughfare Plan; 2) that the proposal site be no closer than 500 feet to the property line of an area zoned residential or an existing residential use; and 3) that the proposed site be no closer than 1000 feet to the property line of another adult business, or to the property line of any church or school. Any of the spatial criteria may be waived upon approval of 51 percent of the surrounding landowners.

In addition to being required to satisfy the spatial requirements of Ordinance 14.-

2. *Site Plan Review.*
Application to establish an adult business shall be made in writing to the Planning Commission. Such application shall specify the type of adult use or uses that will be catered to, and shall be accompanied by a detailed site plan.

The Planning Commission, having a duty to determine whether a particular use will have a deleterious effect on the surrounding area, will not approve a site plan application if any of the following conditions are found to exist:

a) The site is located on other than a major thoroughfare, as designated in the Master Thoroughfare Plan.

b) The site is closer than 500 feet to the property line of an area zoned residential or a residential use.

c) The site is located closer than 1,000 feet to a site having an adult business designation under this section or closer than 1,000 feet to the property line of any church or private or public school.

Any of the above restrictions may be waived if the Planning Commission finds that 51% of the persons owning, residing or doing business within 500 feet of this location approve the use, that approval being evidenced by a petition with notarized signatures, signed by the concerned parties and presented by the petitioner prior to the public hearing.

Further, the site plan shall conform to the specifications as articulated in Section 21.07 [sic] [22.16] of this ordinance and shall contain an elevation of the building and its layout shall be in such a fashion so as not to convey the message of its intended use.

5. *See* Warren Zoning Ordinance, Sections 14.01, 15.01, 17.02F and 17.03.

6. 22.14 PROCEDURES FOR SPECIAL LAND USE APPROVAL.

A. An application for the approval of a special land use permit shall be made by the landowner and occupant of the land on which the special land use is to be located, to the Commission accompanied by the necessary fees and documents as prescribed by the Commission.

02(C), adult uses must locate in one of four zoning districts in Warren.[5] An adult use may locate in a general business district (C–2), in a wholesale and intensive business district (C–3), and in industrial zones (M–1 and M–2). To locate in any of these four zoning districts, an adult use must obtain the special use approval of both the City Planning Commission and the Board of Zoning Appeals. The application for a special use approval must be accompanied by a site plan application.[6] A special use may be permitted only if it satisfies the stan-

B. Upon receipt of an application for a special land use permit, except for those uses provided in Section 14.02 of this Ordinance, the Planning Commission shall review the application and required site plan for conformity with the required ordinances. The Planning Commission shall hold a public hearing at which time the application shall be considered. The public hearing shall be conducted pursuant to the procedure established in Section 4a, Act 207, Public Acts of Michigan 1921, as amended.

Upon receipt of an application for a special land use permit for any use provided for in Section 14.02 of this Ordinance, the Planning Commission shall hold a public hearing and review the application and required site plan for conformity with required ordinance and forward a recommendation regarding same to the City Council for approval.

1. The Special Use Permit shall only be approved if the following general standards are satisifed:

a) The proposed use be compatible with adjacent uses of land;

b) The proposed use be in compliance with the standards of this Ordinance and the conditions imposed thereunder;

c) The proposed use be compatible with the natural environment;

d) The proposed use be compatible with the compacities of public services and facilities affected by the proposed use; and

e) The proposed use be consistent with the public health, safety and welfare of the City.

2. The approving authority may deny, approve, or approve with conditions, a request for special land use permit. The approving authority may require reasonable conditions regarding the location, character, and other features of the proposed use as it is deemed necessary to satisfy the general standards provided herein.

3. Any conditions required for approval of a special land use may include conditions necessary to insure that the public services and facilities affected by a proposed land use or activity will be capable of accommodating increased service and facility loads caused by

the land use or activity, to protect the natural environment and conserve natural resources and energy, to insure compatibility with adjacent uses of land, and to promote the use of land in a socially and economically desirable manner. Conditions imposed shall satisfy the following:

a) Be designed to protect natural resources, the health, safety and welfare and the social and economic well being of those who will use the land use or activity under consideration, residents and landowners immediately adjacent to the proposed land use or activity, and the City as a whole.

b) Be related to the valid exercise of the police power, and purposes which are affected by the proposed use or activity.

c) Be necessary to meet the Intent and Purpose of this Ordinance, be related to the standards established in this Ordinance for the land use or activity under consideration, and be necessary to insure compliance with those standards.

4. The conditions imposed with respect to the approval of a land use permit shall be recorded in the record of the approval action, and shall remain unchanged except upon the mutual consent of the approving authority and the landowner and occupant. The approving authority shall maintain a record of conditions which are changed.

22.16 SITE PLAN REVIEW.

A. Intent—The site plan review process is instituted to provide an opportunity for the approving authority to review a proposed site plan in relation to pedestrian and vehicular circulation, off-street parking, structural relationships, public utilities, landscaping, accessibility and other site design elements which may have an adverse effect upon the public health, safety, morals, and general welfare as well as to provide for the best interests of the property owner.

B. Procedures for Site Plan Review.

1. In addition to those uses specifically requiring site plan approval by this Ordinance, prior to the final processing of an application for a building permit for the construction of any multi-family, mobile home park, commercial or industrial structure the developer and/or petitioner shall submit a site plan to the approving authority for review and approval, showing the location of the principal building or use, general dimensions and proposed height, the location of all accessory buildings, the location of parking areas or accessory buildings, the location of parking areas or driveways, the proposed grade and drainage, the proposed methods of water supply and sewage disposal, the proposed plantings and proposed screening and a building plan to the Fire Commissioner showing proposals for fire safety, fire separation, and egress for life safety. The approving authority shall review such site plan for space and orientation of buildings in relation to off-street parking and ingress and egress to the site; for safety convenience and adequacy of vehicular and pedestrian circulation; for adequacy of landscaping and proposed site improvements and overall conformity to provisions of the Master Plan of the City of Warren for conformity of the uses to the district. The approving authority shall submit copies of said plans to various governmental agencies within and without the local unit of government, such as the City Engineer, Michigan State Highway Department, Macomb County Road Commission, Fire Department, and Traffic Department, in order that their comments may be incorporated into the approving authority findings and recommendations in this matter.

2. An application for approval of a site plan shall be made by an owner of an interest in the land on which the site plan is to be developed or authorized representative of same to the approving authority accompanied by the necessary fees and documents as prescribed by the approving authority.

3. Upon receipt of an application as provided above the approving authority shall give a notice of the time, place, date and purpose of the approving authority meeting at which the site will be considered. Notice of public hearing shall be sent by mail or personal delivery to the owners of property for which approval is being considered, to all persons to whom real property is assessed within 300 feet of the boundary of the property in question, and to the occupants of all structures within 300 feet.

The notice shall be given not less than five (5) days before the date of the public hearing.

4. The appointing authority shall approve a site plan only upon a finding that the proposed use will not, upon the facts known at the time of submission of the site plan, cause undue hardship or create unsafe or hazardous health, or safety conditions or create a nuisance condition to the detriment of adjoining land uses or the general public and only upon a finding that the plan contains the information required by this Ordinance and is in compliance with this Ordinance, the conditions imposed pursuant to this Ordinance, other applicable Ordinances and state and federal statutes. An approval or denial of a site plan must be based on the standards for review of special land uses set forth in Section 22.14B of this Ordinance. Any conditional approval of a site plan must meet the requirements set forth in Section 22.14B, (3) and (4) of this Ordinance. Any required modifications shall be directed to the specific elimination of unsafe or hazardous health or safety conditions or the prevention of nuisance conditions, and shall be so noted.

5. The approving authority shall communicate its approval or recommended site plan modifications to the applicant and the Building Director. If approved, the site plan shall become part of the record of approval, and

dards set forth in Section 22.14 and Section 22.16 of the Warren Zoning Ordinance. Finally, any business wishing to locate in the City Center District, an area zoned C–2 which surrounds a local government complex, must obtain the approval of the City Council.[7]

### B. *The History of the Warren Ordinance*

The history or Ordinance 14.02(C) dates to 1972 when the first adult business located in Warren. At that time, Warren sought to amend its zoning ordinance in order to bring adult uses within its scope. Following consultation between the City Planning Commission and the City Attorney's Office, a proposed ordinance regulating adult uses was prepared and submitted to the City Council for a public hearing on April 16, 1973. During the April 16, 1973 hearing, the City Council tabled the proposed amendments until its next scheduled meeting on May 21, 1973.

The proposed amendments were again considered during the May 21, 1973 meeting of the City Council. The City Council, however, again postponed acting on the amendments in order to await the outcome of the litigation in *Young v. American Mini-Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Following announcement of the Supreme Court's decision in *Young* in 1978, the proposed amendments to the zoning ordinance resurfaced. On May 9, 1978, the Warren City Council voted to adopt Ordinance No. 30–559, an amendment to Section 14.02. This amendment modified Section 14.02 by requiring adult uses to satisfy the spatial limitations described earlier and by requiring adult uses to obtain the consent of 51 percent of the surrounding landowners before a "special use" approval could be granted. A second amendment to Section 14.02, Ordinance No. 30–366, was approved by the City Council on August 22, 1978. Ordinance No. 30–566 enacted only minor modifications.

On December 27, 1978, the Warren City Council approved a third amendment to Section 14.02, Ordinance No. 30–573. This ordinance rescinded the earlier provisions requiring adult use to obtain the approval of 51 percent of the surrounding landowners before locating on a proposed site. Ordinance No. 30–573 instead allowed the spatial requirements of Section 14.02(C) to be waived upon consent of 51 percent of the surrounding landowners. Section 14.02(C) was amended for the last time with the enactment of Ordinance No. 30–657. This amendment was not addressed specifically to adult uses and effected relatively minor changes in the ordinance. In part, Ordinance No. 30–657 acted to bring amusement centers within the purview of the Warren Zoning Ordinance. It is the cumulation of these amendments which the Court is asked to pass judgment on and which the Court shall collectively refer to as Ordinance 14.02(C).

### C. *The Purpose of Ordinance 14.02(C)*

A principal factual dispute in this case concerned the purpose which the City of

---

subsequent actions relating to the activity authorized shall be consistent with the approved site plan, unless a change conforming to the provisions of this Ordinance receives the mutual agreement of the landowner and the approving authority. In cases where the modifications have been recommended, the applicant shall resubmit a site plan incorporating those modifications to the approving authority for its review.

6. If valid building permits have not been obtained within two (2) years from the date of approval of the site plan, the applicant shall appear before the approving authority and request an extension. The approving authority may upon application of a petition filed sixty (60) days before the expiration of the aforementioned two year period, approve an extension for a specified period of up to one (1) year. Subsequent further extensions for periods of up to one (1) year each may be granted subject to a petition filed sixty (60) days prior to expiration of the existing extension. Prior to granting any extension the approving authority shall review the site plan to determine if there have been any changes in circumstances from the standards applied at the time of prior approval. In the event there have been changes, the approving authority may impose new conditions in accordance with Sections 22.14B(3) and (4) of this Ordinance. No site plan approval shall be granted without a public hearing.

7. *See* Warren Zoning Ordinance, Section 21B.07.

Warren sought to achieve in enacting Ordinance 14.02(C). The plaintiffs strenuously argued that Warren sought to achieve no legitimate purpose in enacting Ordinance 14.02(C) and claimed that the ordinance serves only to restrict access to protected speech. The defendants argued that, by enacting Ordinance 14.02(C), Warren was acting to protect its neighborhoods and prevent the spread of urban blight.

Notably, none of the amendments to Section 14.02(C) contains any findings of fact or statements of purpose. Moreover, the City Council conducted only limited public hearing in connection with the amendments that now comprise Ordinance 14.02(C). Moreover, defendants submitted no evidence showing that the City Council, as a whole, ever considered any testimony or documents detailing the benefits of the dispersal type of zoning that was adopted. Looking almost exclusively to these facts, the plaintiffs argue that Ordinance 14.02(C) had no legitimate purpose when enacted and now acts only to suppress protected speech. Nevertheless, the plaintiffs have failed to consider many relevant facts and indicia of legislative intent which the Court finds revealing.

■ Having sifted carefully through the evidence before it, the Court believes that evidence of the purpose sought to be achieved through the enactment of Ordinance 14.02(C) can be found in three places. It can be found in the Warren City Council's actions and reliance upon Detroit's experience in passing the ordinance at issue in *Young v. American Mini-Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Evidence of the purpose of Ordinance 14.02(C) can also be found in the testimony of Mr. John Daley, the principal draftsman of Ordinance 14.02(C), and in the testimony of various members of the Warren City Council. Finally, such evidence can be discerned from the requirements of the ordinance itself. The intent of the City of Warren in enacting Ordinance 14.02(C) is

not, as plaintiffs argue, conclusively established by the absence of an expression of legislative intent in the Ordinance. Intent is not a one-dimensional characteristic.

■ As with any legislative history, determining the precise purpose sought to be achieved by the enactment of Ordinance 14.02(C) is difficult. Nevertheless, the Court believes that a careful review of the record in this case compels a finding that Warren was acting to protect residential life within its community. Although this purpose may not have been the only purpose behind Ordinance 14.02(C), it clearly was a principal and motivating force. Moreover, as the Court will note later in its Conclusions of Law, this purpose, standing alone, is a sufficient justification for the ordinance.

Following the opening of the first adult use in Warren in 1972, the City sought to include these uses within the scope of its zoning ordinance. Part and parcel to Warren's Zoning Ordinance is the City's plan for ordered future growth and, in particular, Warren's paramount goal of protecting residential life within its community. The task of incorporating adult uses within the design of the Warren Zoning Ordinance was delegated to Warren City Planner John Daley. In drafting the proposed amendments to Section 14.02 of the Warren Zoning Ordinance, Mr. Daley relied heavily upon Detroit's various experiences in enacting the zoning ordinance at issue in *Young.* Detroit is a contiguous municipal neighbor of Warren whose experience has been that concentrated numbers of adult uses are a source of urban blight.[8] Mr. Daley contacted city officials in Detroit in order to discuss the nature and effectiveness of the Detroit Ordinance and requested and received from these officials a copy of the Detroit Ordinance. Mr. Daley used the Detroit Ordinance in preparing the pro-

---

**8.** *See Young v. American Mini-Theatres,* 427 U.S. 50, 54 n. 6, 96 S.Ct. 2440, 2444 n. 6, 49 L.Ed.2d 310 (1976).

posed amendments which culminated in Ordinance 30–559.[9]

Various members of the Warren City Council also relied upon the experience of Detroit in *Young* in considering and acting upon the proposed amendments to the Warren Zoning Ordinance. Warren City Councilman Louis Burdi testified that he and other members of the City Council were keenly aware of the various issues surrounding the litigation in *Young* and that he, in fact, received and reviewed a copy of the Supreme Court's decision in *Young*. Similarly, Michigan Circuit Judge George Montgomery, a city councilman from 1971 to 1976, testified that he placed the proposed ordinance on the Warren City Council Agenda and that he relied upon Detroit's experiences. Judge Montgomery also stated that he sought to protect Warren's neighborhoods in proposing that the zoning ordinance be amended.

The testimony of Messrs. Daley, Burdi and Montgomery clearly supports the conclusion that Warren relied heavily upon the experiences of Detroit in enacting its adult use zoning ordinance. Moreover, this awareness of the issues surrounding the litigation in *Young* is the only possible explanation for the action of the Warren City Council in tabling the proposed amendments from 1973 to 1978.

The Court also believes that the finding that a principal purpose of the City of Warren in enacting Ordinance 14.02(C) was to protect residential life is consistent with the requirements and impact of the Ordinance. On its face, Ordinance 14.02(C) separates adult uses from residential areas.

The totality of these facts clearly indicates that in enacting Ordinance 14.02(C) Warren had, as at least one principal purpose, the preservation of family life and the protection of its neighborhoods. Accordingly, Warren acted to minimize the adverse impact which adult uses have on residential areas, much in the same way it has acted to minimize the impact of industrial areas on residential areas.

### D. *Potential Adult Use Sites*

In part, the plaintiffs seek to attack the validity of Ordinance 14.02(C) by arguing that its effect is to impermissibly limit the total number of potential sites for adult uses in Warren and thereby limit access to such protected speech. Hence, the plaintiffs introduced various proofs at trial in an attempt to establish the factual basis for their argument. The defendants sharply contested these proofs and, unquestionably, a majority of the proofs offered by both plaintiffs and defendants at trial related to this issue.

The City of Warren is 36 square miles in size and is divided into 36 one square mile sections. The boundary line of these sections are coterminous with various major roads that traverse the City. Adult uses are permitted to locate in 18 of the 36 sections, or in 50 percent of the City's sections. Applying the spatial requirements of Ordinance 14.02(C) to the various commercial sites in these sections, adult uses are limited to locating on any of twelve major roads.[10] Looking to the sites along these thoroughfares, the plaintiffs' and defendants' estimates of the total number of available sites differ greatly. The plaintiffs argue that Ordinance 14.02(C) permits only three commercially practicable sites for adult uses in all of Warren while the defendants claim that there are at least 178 potential sites.

In support of their claim that Ordinance 14.02(C) allows for only three commercially feasible sites in Warren, the plaintiffs introduced into evidence the expert testimony of Mr. Karl Freed. Mr. Freed is a planning consultant with a Masters Degree in urban economic planning. Mr. Freed testified that in his opinion only three commercially

---

9. That the Warren Ordinance is not identical to the Detroit Ordinance does not show, as plaintiffs argue, that the Detroit Ordinance did not serve as a model, at least in part, for the Warren Ordinance.

10. Inasmuch as the Court finds the major thoroughfare requirement of Warren Zoning Ordinance, Section 14.02(C)(2)(a), to be invalid, this number includes sites along Eight Mile, Eleven Mile and Mound Roads. *See infra.*

feasible sites are available in Warren for adult uses given the requirements of Ordinance 14.02(C).

Applying the spatial criteria of Ordinance 14.02(C) to the various land sites in Warren that are available for commercial use, Mr. Freed determined that a maximum of 45 potential adult use sites exist. Mr. Freed then excluded from consideration 16 sites which he believed were too large or too small to be commercially feasible. Accepting that Ordinance 14.02(C) requires adult uses to be located at least 1000 feet apart, Mr. Freed concluded that only 14 adult uses could locate on the remaining 28 sites. Excluding from consideration any sites which are currently being utilized, Mr. Freed concluded that only three sites were available for adult use in Warren given the requirements of the zoning ordinance.

■ Having carefully reviewed Mr. Freed's testimony, the Court finds that it must be rejected for a number of reasons. Initially, the Court finds that Mr. Freed improperly excluded from consideration any site on Eight Mile Road, Eleven Mile Road, and Mound Road.[11] The Court rejects Mr. Freed's conclusions as to commercial feasibility because it finds that his opinions in this regard were outside the scope of his expertise. Moreover, portions of Mr. Freed's testimony regarding the commercial feasibility of various sites must be rejected as self-contradictory. Mr. Freed testified, for example, that various sites were not commercially feasible but readily admitted on cross-examination that if a businessman were willing to make an adequate investment those sites would be commercially feasible.

■ The Court also rejects Mr. Freed's conclusion that various sites must be excluded because they are currently being utilized. Mr. Freed improperly presupposed that the City of Warren is constitutionally required to ensure that particular commercial sites are available for occupancy. Moreover, Mr. Freed assumed, without foundation, that a sufficient offer could not be made to prompt the sale of any given parcel of land.

■ The Court finds that Mr. Freed improperly excluded a number of sites as not meeting the minimum lot size and width requirements of the Warren Zoning Ordinance. Mr. Freed simply failed to consider the ability of a land owner to split and combine lots in order to meet these zoning requirements. Similarly, Mr. Freed improperly excluded all sites within 500 feet of a residential use. While Ordinance 14.-02(C) does require adult uses to locate at least 500 feet from a residential use,[12] Mr. Freed failed to consider that residential uses are nonconforming uses which may be purchased and utilized commercially. A residential use is such only by virtue of its use. Unlike a site in a residential zone which may be used only for residential purposes, a residential use is a nonconforming use in a nonresidential zone which may be used either residentially or commercially.

■ In addition to the substantive errors which the Court finds in Mr. Freed's analysis, the Court finds that his credibility is otherwise suspect. Specifically, Mr. Freed's personal knowledge of the various commercial sites is limited in that he never visited the sites in question and, in fact, never entered the City of Warren in connection with the preparation of his report. Accordingly, the Court rejects the plaintiffs' claim that Ordinance 14.02(C) allows for only three potential adult use sites in Warren.

■ In support of their claim that Ordinance 14.02(C) allows for at least 178 potential sites for adult uses in Warren, the defendants introduced into evidence the testimony of Mr. Roland Nelson. Mr. Nel-

---

11. *See infra.*

12. During trial, the defendants suggested that adult uses can locate closer than 500 feet to residential uses because residential uses are nonconforming uses which the law does not protect. Nevertheless, such an argument is completely incongruous with the plain meaning of Ordinance 14.02(C) and the Court rejects it.

son is an expert real estate appraiser who is one of only 400 certified real estate counselors in the United States and one of only eight senior real estate analysts in Michigan. Mr. Nelson has published some 23 articles in his area of expertise and has had a broad range of experience. Succinctly, Mr. Nelson possesses the highest qualifications.

Applying the requirements of the Warren Zoning Ordinance to the various commercial sites in Warren, Mr. Nelson testified that 98 parcels of land exist on which adult uses can locate. Moreover, Mr. Nelson testified that many of those 98 parcels contain multiple sites and that a total of 178 potential adult use sites exist when multiple sites are accounted for. In reaching this conclusion, Mr. Nelson excluded a number of sites as commercially unfeasible. He excluded, for example, approximately twelve sites presently subject to long term leases or otherwise not available. Similarly, Mr. Nelson excluded from his list of potential sites various industrial uses.

The Court has carefully reviewed Mr. Nelson's testimony and the various relevant exhibits. Having done so, the Court accepts the testimony and rejects plaintiffs' challenges.

Initially, the Court rejects plaintiffs' argument that Mr. Nelson improperly included in his list of potential sites 43 locations on Mound Road, Eleven Mile Road and Eight Mile Road. The plaintiffs argue that Ordinance 14.02(C) requires adult uses to locate on major thoroughfares "as designated in the Master Thoroughfare Plan." Looking to the Master Thoroughfare Plan for the City of Warren, plaintiffs point out that Mound Road, Eleven Mile Road, and Eight Mile Road are designated as expressways and super highways. The plaintiffs therefore argue that there are no potential sites for adult uses on these roads because

they are not designated major thoroughfares. Accordingly, plaintiffs argue that the 43 sites which are located on these roads and included in Mr. Nelson's list of potential sites must be excluded.

The Court rejects plaintiffs' arguments because it finds that although Eight Mile Road, Eleven Mile Road and Mound Road are not designated as major thoroughfares, the City of Warren has never interpreted its zoning ordinance so as to exclude adult uses from locating along these roads and is not attempting to do so now. Indeed, the testimony of Mr. Daley clearly demonstrates that Warren has not considered these roads to not be major thoroughfares and that, in fact, the designations of these roads do not accurately reflect their use.[13]

The Court also finds that potential sites along Eight Mile Road, Eleven Mile Road and Mound Road must not be excluded because it finds the major thoroughfare requirement unconstitutional. As the Court will discuss more fully in its Conclusions of Law, it finds Ordinance 14.02(C)'s mandate that adult use located on a major thoroughfare to be unconstitutional. Given this finding and given the rule of partial invalidity which the Court must follow in this case,[14] the Court believes that any site located along Eight Mile Road, Eleven Mile Road and Mound Road must be included as a potential site regardless of whether or not it would otherwise be includable.

The plaintiffs next argue that Mr. Nelson's testimony must be rejected because his list of proposed sites includes sixteen sites which do not meet the minimum lot size and width requirements of the Warren Zoning Ordinance.[15] This challenge may be disposed of quickly. Mr. Nelson correctly found that lots can be split and com-

13. Mound Road, for example, is designated as an expressway on the Master Thoroughfare Plan but is not an expressway in use. Moreover, given the decision of the Michigan Supreme Court in *Gordon v. Warren Planning Comm.*, 388 Mich. 82, 199 N.W.2d 465 (1972), Warren is prohibited from using it as such.

14. *Brockett v. Spokane Arcades, Inc.*, —— U.S. ——, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

15. *See* Warren Zoning Ordinance, Sections 14.-05 *et seq.*, 15.04 *et seq.* and 17.06.

bined in order to satisfy lot size and width requirements.[16]

Plaintiffs' final challenge to Mr. Nelson's testimony is that he improperly included in his list of potential sites five sites that are within 500 feet of residential uses. Nevertheless, as noted earlier, the character of a residential use may be changed by changing its use. In the instant case, nothing prevents the plaintiffs from purchasing such a nonconforming use and using it or a surrounding site for adult purposes. Thus, those sites within 500 feet of a residential use are potential sites for an adult use.

Accordingly, the Court finds that Ordinance 14.02(C) allows for at least 178 potential sites for adult uses in the City of Warren.

### E. Urban Blight

The defense of Ordinance 14.02(C) in this case is predicated on three claims: 1) adult uses are a source of urban blight; 2) the two existing uses in Warren have blighted the neighborhoods in which they are located; and 3) the proposed uses will blight the neighborhoods in which they are located if allowed to open. Accordingly, the defendants introduced evidence to establish each of these elements. The plaintiffs objected strenuously to these proofs arguing that they are, at best, irrelevant post hoc justifications of Ordinance 14.02(C). Specifically, the plaintiffs argued that because the Warren City Council did not have the studies of urban blight which were presented to the Court at trial before it at the time it enacted Ordinance 14.02(C), these proofs are irrelevant and inadmissible. Having carefully considered plaintiffs' arguments, the Court finds that they must be rejected. However, because the admissibility of this evidence is governed by a question of law, the Court will reserve its discussion of this issue for its Conclusions of Law.

In order to support their claims that adult uses have a blighting impact on residential areas and that the spatial requirements of Ordinance 14.02(C) are a direct means of minimizing that impact, the defendants introduced into evidence the testimony of Dr. Barbara Bryant and Mr. Gerald Luedtke. Cumulatively, the testimony of Dr Bryant and Mr. Luedtke established a strong factual basis for defendants' claims.

Dr. Barbara Bryant, Ph.D., is a market opinion research expert who testified about the attitudes of the citizens of Warren regarding adult uses and their willingness to live or shop in close proximity to such uses. Dr. Bryant conducted a survey of approximately 300 residents in Warren. In addition, Dr. Bryant conducted a highly detailed overstudy of 50 residents in each of the two neighborhoods surrounding the two existing adult uses in Warren.

Although Dr. Bryant's exhaustive study contains many conclusions, the crucial conclusions may be set forth briefly. The results of Dr. Bryant's study revealed that, if an adult bookstore opened up in their neighborhood, 46 percent of the residents surveyed would shop elsewhere for necessary items such as food or drug purchases while 50 percent would shop elsewhere for convenience purchases. Similarly, Dr. Bryant's study demonstrated that one-half of the parents having children ages 6 to 17 would no longer permit their children to run errands and fully 75 percent would not allow their children to shop near adult uses. Finally, 42 and 48 percent of the people surveyed in the neighborhoods surrounding the two existing adult uses indicated that they would not have purchased their present homes if an adult use had been located there at the time they bought.

Defendants' witness Mr. Gerald Luedtke is a professional urban planning consultant. He has a masters degree from Yale University and has had extensive experience in urban planning both in government and as a private consultant to government. Mr. Luedtke has published numerous articles in his field of expertise and has taught various college courses in urban planning.

---

16. See Warren Zoning Ordinance, Section 2.32.

At trial, Mr. Leudtke testified about the impact which adult uses have had on residential areas in Warren. He based his opinions upon first-hand observations he made of Warren, on aerial photographic observations, and on census data. Initially, Mr. Luedtke identified four sources of urban blight in Warren: 1) Detroit; 2) traffic; 3) industrial uses; and 4) adult uses. Turning to adult uses as a specific source of blight in Warren, Mr. Luedtke indicated that adult uses are a source of blight or urban deterioration because they cause residents in the surrounding neighborhoods to become disinterested in their community and less willing to maintain their homes in a state of good repair.

In the study which Mr. Luedtke made of the neighborhoods surrounding the two existing adult uses in Warren, he found that the adult uses had dramatically blighted those neighborhoods. Mr. Luedtke reached this conclusion by comparing the physical condition of houses within an entire neighborhood to the physical condition of the houses in an impact area immediately adjacent to the existing adult uses. Each house was characterized as being in sound repair, as needing minor repairs, as needing major repairs, or as being substandard.

Mr. Luedtke first studied the neighborhood surrounding Bookworld, one of the two existing adult uses. In his study, Mr. Luedtke found that while 26 percent of the houses in the overall neighborhood were in sound condition, only 2 percent of the houses within the impact area were sound. Conversely, while only 9.5 percent of the houses in the overall neighborhood were substandard, 21.5 percent of the houses in the impact area were substandard. Similarly, 52.7 percent of the houses in the impact areas needed major repairs while only 31 percent of the houses in the overall neighborhood required similar repairs. The remaining 22.6 percent of the houses in the impact area needed only minor repairs compared with 33 percent of the houses in

the entire area. In perspective, these findings indicate that approximately 60 percent of the houses in the total area surrounding Bookworld were either in sound condition or needed only minor repairs whereas only 25 percent of the homes in the impact areas immediately adjacent to the bookstore were in a similar state of good repair. Conversely, only 40 percent of the houses in the entire area required major repairs or were in substandard condition while almost 75 percent of the houses in the immediate impact area were in such a condition of disrepair. Mr. Luedtke's findings in the neighborhood surrounding Danish Adult News, the second existing adult use, were substantially similar.[17]

Although Dr. Bryant's study and Mr. Luedtke's study were prepared separately, and focused on different issues, they indisputably corroborate one another. Moreover, the similarities are such that they cannot be characterized as being merely coincidental but, rather, are attributable to the similarity of their factual bases. Summarized generally, Mr. Luedtke found that adult uses give rise to urban blight by causing residents in adjacent neighborhoods to become disinterested in their communities. Having observed the residential areas surrounding the two existing uses in Warren, Mr. Luedtke found that such urban deterioration had already occurred. These findings are clearly supported by Dr. Bryant's study which revealed that Warren residents are reluctant to shop or live near adult uses. Indeed, many residents surveyed indicated that they would change their shopping patterns if an adult use were to open up nearby and would require their children to do so also. Other residents indicated that they would not have purchased their current homes had they known they were moving near the site of an adult use. These facts, in turn, would have a profound and adverse impact on the various affected businesses which would further affect the vitality of the community.

---

**17.** To the extent that the urban blight in the area may be characterized as less severe, the Court finds that that fact can be explained by the fact that Danish Adult News is separated from the surrounding neighborhood by a greater distance than Bookworld.

Having carefully considered all of the evidence, the Court accepts the opinions of Mr. Luedtke and Dr. Bryant. The evidence in this case clearly demonstrates that adult uses are a source of urban blight and that the two existing adult uses in Warren, Danish Adult News and Bookworld, have in fact blighted the neighborhoods in which they are located.

### F. *The Proposed Adult Use Sites*

The last factual issue explored by the parties at trial was the proximity of the proposed uses to various residential areas and the projected impact of these proposed uses on the surrounding neighborhoods.

The proposed sites at 5583 East Eight Mile Road and 21083 Mound Road are located in a residential area where the median household income is $21,556. 83 percent of the households in this area are family households and 90 percent of the residents own or are buying their homes. 54 percent of the residents have owned their homes for 20 years or more and only 3 percent of the homes are for sale. The proposed adult use sites are in extreme proximity to these homes. Indeed, the site at 5583 East Eight Mile Road is separated from this area only by the width of an alley, 20 to 25 feet. Moreover, because there is no available offstreet parking in this area, patrons of the proposed site would be forced to use the alley for parking.

The proposed sites at 15184 and 15192 Thirteen Mile Road are located close to each other in a community shopping center which is surrounded by new single family homes. 97 percent of the households in this neighborhood are family households and 98 percent of these people own or are buying their homes. 50 percent have lived in their homes for 20 years or longer and only one percent are for sale. This is a young neighborhood with 40 percent of the population being under 20 years of age. The median income is $30,673.

The proposed site at 4061 East Eight Mile Road is located in a residential area where the median income is $18,064. Single family dwellings are located directly behind the proposed site and there is major new constructon underway in the area. Overall, the neighborhood surrounding the proposed site at 4061 East Eight Mile Road and the other proposed sites are stable working class residential areas with families of modest incomes.

Examining the proximity of the proposed sites and the surrounding neighborhoods in light of the general findings concerning urban blight, it is clear that, if allowed to open, the proposed adult uses would have a profound and adverse impact on the residential areas to which they are immediately adjacent. Moreover, the spatial criteria set forth in Ordinance 14.02(C) are the minimum requirements sufficient to minimize the impact of adult uses on residential areas in Warren.

## II. CONCLUSIONS OF LAW

The plaintiffs in this case have attacked Ordinance 14.02(C) on several grounds. Initially, the plaintiffs argue that the Ordinance is invalid because at least three key sections are void for vagueness. Similarly, the plaintiffs argue that Ordinance 14.02(C) is impermissibly overbroad. Finally, the plaintiffs argue that Ordinance 14.02(C) is constitutionally deficient when analyzed under the criteria set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

### A. *Vagueness*

The plaintiffs' claim that Ordinance 14.02(C) is unconstitutionally vague is comprised of three separate claims. Initially, the plaintiffs argue that the ordinance inadequately defines the term "adult bookstore." Similarly, plaintiffs claim that it inadequately defines the term "adult minimotion picture theatre." Finally, the plaintiffs argue that the special land use permit and site plan approval procedures leave an improper degree of discretion in local officials.

Under the void-for-vagueness doctrine, a plaintiff may challenge a legislative enactment by arguing that it does not pro-

vide adequate notice of proscribed conduct. This doctrine serves a three-fold purpose. First, by requiring legislatures to provide adequate notice of prohibited conduct, the doctrine ensures that innocent citizens will not unknowingly become subject to the imposition of criminal penalties. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). *See also Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Second, the vagueness doctrine ensures that legislative bodies will not improperly delegate authority (or discretion) to law enforcement officials. By requiring legislatures to provide minimal guidelines to govern law enforcement, the vagueness doctrine protects against the imposition of criminal sanctions from becoming subject to the 'personal predilections' of individual policemen, prosecutors or judges. *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983). Finally, the vagueness doctrine prevents vague laws from chilling First Amendment expression.

These concerns were summarized by Justice Powell in *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), where he wrote that

> [t]he doctrine incorporates notions of fair notice or warning. [Footnote omitted.] Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement." [Footnote omitted.] Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.

*Id.* at 573, 94 S.Ct. at 1247.

■ Generally, in order to successfully attack a legislative enactment on vagueness grounds, one must show that it con-

tains "no standard whatever by which criminality could be ascertained." *Parker v. Levy,* 417 U.S. 733, 755, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974). *See also NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). However, "[t]he general test of vagueness applies with particular force in review of laws dealing with speech. '[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser.'" *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) *quoting Smith v. California,* 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959).

■ Ordinance 14.02(C)(1)(a) defines an adult bookstore as

> [a]n establishment having a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Special Anatomical Areas", (as defined below), or an establishment with a segment or section devoted to the sale or display of such material.

Plaintiffs argue that this definition is infirm because it fails to define how "a substantial or significant portion" is to be measured and fails to specify a level which, if achieved, will trigger application of the spatial requirements of the Ordinance. Plaintiffs also argue that Ordinance 14.-02(C) is unconstitutional because they intend to sell "some" materials dealing with "specified sexual activities" and are uncertain whether the materials which they intend to offer for sale will constitute a "substantial or significant portion" of their stock in trade.[18]

---

18. Plaintiffs' argument in this regard has significantly clouded various issues presented in this case. The June 27, 1984 application for build-

ing permit of plaintiff Detroit Novelty and Toy, Inc. stated that

> "Applicant intends to use the premises for the sale of books, magazines, motion picture

Similarly, the plaintiffs attack Ordinance 14.02(C) as unconstitutional by arguing that the definition of "adult mini-motion picture theatre" is inadequate. In Section 14.02(C)(1)(c), an adult mini-motion picture theatre is defined as

> An enclosed building with a capacity for less than 50 persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Activities" or "Specified Anatomical Areas", (as defined below) for observation by patrons therein.

The plaintiffs argue that this definition is void for vagueness because it fails to adequately specify how one determines whether a film is "characterized or distinguished by an emphasis" relating to "specified [sexual] activities."

Having considered plaintiffs' challenges to the definitional sections in question, the Court finds them to be reasonably specific and precise, "bearing in mind that unavoidable imprecision is not fatal and celestial precision is not necessary." *Hart Book Stores, Inc. v. Edminsten*, 612 F.2d 821, 833 (4th Cir.1983), *cert. denied* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). Warren's adult use zoning ordinance contains constitutionally sufficient standards of prohibited conduct such that men of ordinary intelligence may understand what conduct it proscribes. As Judge Kennedy noted in *Nortown Theatre Incorporated v. Gribbs*, 373 F.Supp. 363, 367 (E.D.Mich. 1974), *aff'd* on other grounds *sub nom. Young v. American Mini-Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)

> the word "substantial" as used in the definition of Adult Book Store is not so indefinite as to render the Ordinance void and unenforceable. That term has been construed as having an ascertainable meaning in numerous statutory schemes. See, e.g., *Busch v. Service Plastics, Inc.*, 261 F.Supp. 136, 141 (N.D.Ohio 1966); *Roop v. Richardson*, 324 F.Supp. 1130 (W.D.Va.1971); *State ex rel. Saveland Park Holding Corp. v. Wieland*, 269 Wis. 262, 69 N.W.2d 217, 224 [ (1955) ].

In addition to the authority noted by Judge Kennedy, the term "substantial" appears in the United States Code some 1157 times. More to the point, the phrase "substantial portion" appears 51 times in the United States Code and is included in various portions of the patent laws, securities laws, and civil rights laws.[19] The provi-

---

films, video tapes and various sundries, some of which deal with sex and nudity in an honest and forthright manner. Additionally, applicant intends to install on the premises, as shown on the attached plans, booths which contain coin operated motion picture and/or video devices which will display/depict material which deals with sex and nudity in an honest and forthright manner. Further, some of the said booths, as more particularly set forth on said plans, will feature a state in which live theatrical performance will occur in which said performance will include in part nude and/or semi-nude dancing."
At trial, the plaintiffs introduced no evidence regarding what their intended sales are or might be other than to say they intended to sell "some" such materials. Indeed, the plaintiffs or their owners were never called upon to testify and the Court has no knowledge of what materials they intend to sell. Yet, despite these facts, the plaintiffs ask the Court for a declaratory ruling that their unknown intended sales do not constitute a "substantial or significant portion" and that Ordinance 14.02(C) is therefore unconstitutionally vague. Nevertheless, on its face, the term "substantial" is not the equivalent of

"some." Moreover, given this Court's finding that the term "substantial" is constitutionally adequate, it declines to invalidate the Ordinance on this ground. Additionally, the Court will note that it feels strongly that plaintiffs' attempts to equate the term "substantial" with "some" without giving "some" any quantifiable value led to the confusion in Mr. Daley's testimony noted by plaintiffs.

19. *See:* 7 U.S.C.A. § 2133 (1973).
Banks and Banking, 12 U.S.C.A. § 1749aaa–5 (1980).
Civil Obedience Act of 1968, 18 U.S.C.A. § 245(b)(3) (1969).
Civil Rights Act of 1964, 42 U.S.C.A. § 2000a(c) (1976).
Courts and Judges, 28 U.S.C.A. §§ 456(d) and 460(b) (Supp.1985).
Defense Housing, 42 U.S.C.A. § 1581 (1978).
Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1107(e)(1)(B) and 1403(b)(2) (1985).
Endangered Species Act Amendments of 1982, 16 U.S.C.A. § 1539(b)(2)(B) (1985).
Energy Policy and Conservation Act, 42 U.S.C.A. §§ 6234 and 6235 (1983).

sions of the 1964 Civil Rights Act that deal with public accommodations, for example, are made applicable to any business that affects interstate commerce. A business will be said to have an affect on commerce if "a *substantial portion* of the food which it serves ... has moved in commerce." 1964 Civil Rights Act, 42 U.S.C.A. § 2000a(c) (1976).

■■■■■■ Although the Court finds the challenged definitional sections of Ordinance 14.02(C) valid, it agrees with the plaintiffs that the special land use approval procedure and site plan review are unconstitutional except as they apply to the City Center District. These procedures are unconstitutional in that they vest an improper degree of discretion in various local officials.

As noted earlier, in order for an adult bookstore to locate in Warren, it must obtain the special use approval of both the City Planning Commission and the Board of Zoning Appeals. The application for a special use must be accompanied by a site plan application. Having reviewed the challenged procedures, the Court finds that they are invalid because they vest an improper degree of discretion in local officials. *Entertainment Concepts, Inc. III v. Maciejewski*, 631 F.2d 497 (7th Cir.1980), *cert. denied* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1980). The lack of time limits governing the Commission and Board of Zoning Appeals' decision raise the possibility that these boards could effectively

exclude such adult entertainment facilities from Warren altogether. Similarly, the indefinite general guidelines governing the issuance of a special use approval improperly vest unbridled discretion in local officials. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). Accordingly, the Court enjoins the City of Warren from enforcing Section 22.14 and 22.16 of its zoning ordinance.

In contrast, the Court does not find that the discretion vested in the various governmental bodies for approving land uses in the City Center District is unconstitutional. Here, the City of Warren needs the ability to require special permits for a small historical and cultural area of importance to the community.

### B. *Overbreadth*

■■■■ Plaintiffs next attack Ordinance 14.02(C) by arguing that it is unconstitutionally overbroad. Unlike the void-for-vagueness doctrine, the overbreadth doctrine is not rooted in Due Process notions of fair notice. Rather, its purpose is to ensure that governmental actions "to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1958). *See also*

Farm Housing, 42 U.S.C.A. § 1484 (1978).
Foreign Assistance Act of 1961, 22 U.S.C.A. §§ 2151F(c)(3)(B), 3651(2) and 3984(a) (Supp. 1985).
Infringement of Patents, 35 U.S.C.A. § 271(f)(1) (Supp.1985).
Internal Revenue Code of 1954, 26 U.S.C.A. §§ 172, 280 G, 503, 4252, 6427, 7507 and 7701 (1978 and Supps.).
Investment Companies, 15 U.S.C.A. §§ 80a–2(a)(5) and 80b–2(a)(2) (1981).
Job Training Partnership Act, 29 U.S.C.A. §§ 1518(c)(2)(B)(v) and 1672(a)(1) (1985).
Merchant Marine Act of 1936, 46 U.S.C.A. § 111(b) (1975)
Navigation & Navigable Waters, 33 U.S.C.A. § 1286(f)(1) (Supp.1985).
Newspaper Preservation Act, 15 U.S.C.A. § 1802(4) (1982).

Petroleum Marketing Practices Act, 15 U.S.C.A. § 2821(11) (1982).
Public Health Service, 42 U.S.C.A. §§ 300e–1 and 300n–1 (1982).
Public Lands, 43 U.S.C.A. § 1523(c) (Supp. 1985).
Public Works Program, 42 U.S.C.A. § 2642 (1973).
Securities Exchanges, 15 U.S.C.A. § 78c(a)(b) (1981).
Student Assistance, 20 U.S.C.A. §§ 1083(b)(1), 1087–2 and 1136d(2) (1978 and Supp.1985).
Trade Act of 1974, 19 U.S.C.A. § 2251(b)(2)(C) (1980).
Water Resources, 42 U.S.C.A. § 1962d–14a (1981).

*Zwickler v. Koota,* 389 U.S. 241, 250–51, 88 S.Ct. 391, 396–97, 19 L.Ed.2d 444 (1967).

 A plaintiff has standing to challenge a legislative enactment on overbreadth grounds as long as the legislation is capable of reaching constitutionally protected speech. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Thus, a plaintiff may challenge legislation on overbreadth grounds even though the enactment may be permissibly applied to his activities. The overbreadth doctrine is, however, an exception to the general rule that "a person to whom a statute or statutes may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Id.* at 610, 93 S.Ct. at 2914. Accordingly, the Supreme Court has limited its application to cases of "real" overbreadth.

It remains a "matter of no little difficulty" to determine when a law may properly be held void on its face and when "such summary action" is inappropriate. *Coates v. City of Cincinnati,* 402 US 611, 617, 29 L Ed 2d 214, 91 S Ct 1686 (1971) (separate opinion of Black, J.). But the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power

to proscribe. Cf. *Alderman v United States,* 394 US 165, 174–175, 22 L Ed 2d 176, 89 S.Ct 961 (1969). To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied. (Footnote omitted.)

*Id.* at 615–16, 93 S.Ct. at 2917–18. *See also Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

 In this case before the Court, the plaintiffs have largely intertwined their vagueness and overbreadth arguments. Nevertheless, the doctrines of vagueness and overbreadth are conceptually distinct and the Court believes that the crux of plaintiffs' challenges to Ordinance 14.02(C) is that it is impermissibly vague. Turning to the merits of plaintiffs' overbreadth arguments, the Court finds that it must be rejected. Ordinance 14.02(C) is appropriately limited and contains no substantial overbreadth such as would require its invalidation.

## C. *Equal Protection*

Putting aside plaintiffs' overbreadth and vagueness challenges for the moment, the crux of plaintiffs' attack against Ordinance 14.02(C) is their claim that the Ordinance serves no legitimate governmental interest and acts only to dramatically limit access to protected speech. In this regard, the plaintiffs argue that Ordinance 14.02(C) is a content based regulation which must be analyzed under the four factors set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

In *O'Brien,* the Supreme Court considered a First Amendment challenge to a conviction under federal law for the knowing destruction of a selective service registration certificate. The Court noted that in

addressing such symbolic speech challenges, a Court should consider four factors:

1) whether the action taken is within the constitutional power of the government; and

2) whether the action furthers an important or substantial governmental interest; and

3) whether the governmental interest is unrelated to the suppression of free speech; and

4) whether the incidental restriction on free speech is no greater than is essential to further the governmental interest.

*Id.* at 377, 88 S.Ct. at 1679.

The plaintiffs argue that *O'Brien* provides the relevant criteria which must be addressed in considering the validity of Ordinance 14.02(C). Although *O'Brien* was a symbolic speech case and recognizing that the Supreme Court did not explicitly adopt the *O'Brien* test to zoning cases in *Young*, the Court believes, that the *O'Brien* factors provide a workable framework in which plaintiffs' various claims may be analyzed.

### 1. *The Governmental Power to Zone*

■ The first factor which *O'Brien* requires this Court to consider is whether the action taken by the City of Warren is within the constitutional power of the City. This is, perhaps, the easiest factor to address inasmuch as it is beyond all dispute that local municipalities are empowered to regulate land use in order to maintain or improve the quality of life within their communities. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Village of Belle Terre v. Boraas*, 416 U.S. 194, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); and *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Nevertheless, "the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'" *Schad v. Mt. Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671, *quoting Moore v. City of East Cleveland*,

431 U.S. 494, 514, 97 S.Ct. 1932, 1943, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring).

### 2. *The Governmental Interest*

■ The second and third *O'Brien* factors are closely related. Together, they require that any municipal ordinance that comes into contact with a constitutionally protected freedom serve an important governmental interest unrelated to the suppression of that freedom. *See United States v. O'Brien*, 391 U.S. at 376–77, 88 S.Ct. at 1678–79 and *Young v. American Mini Theatres*, 427 U.S. at 62–63, 96 S.Ct. at 2448.

Looking to the second and third *O'Brien* criteria, the plaintiffs argue that Ordinance 14.02(C) is invalid because it was not enacted to further any constitutionally adequate interest and acts only to suppress free speech. The defendants strenuously argue that the Ordinance was enacted in order to protect residential life in Warren. Part and parcel to this argument is a dispute regarding the admissibility of the testimony of Dr. Bryant and Mr. Luedtke.

The plaintiffs' challenge to the purpose of Ordinance 14.02(C) is comprised of two elements. First, plaintiffs argue that Warren sought to achieve no legitimate purpose in enacting the Ordinance. Second, plaintiffs argue that the enactment of Ordinance 14.02(C) is constitutionally infirm because it lacks an adequate factual basis. Having carefully considered plaintiffs' arguments, the Court rejects them and the factual premises upon which they are founded.

Initially, the Court rejects plaintiffs' premise that Warren sought to vindicate no legitimate governmental interest in enacting Ordinance 14.02(C). The plaintiffs seemingly argue that because the Ordinance does not contain an expression of intent, and because the relevant amendments were passed with little discussion, Warren sought to achieve no legitimate purpose. Simply stated, the plaintiffs ask this Court to irrebuttably presume the ex-

istence of an impermissible purpose. This the Court will not do.

Statements of legislative intent and legislative findings of fact impart no talismanic quality to the enactments they are a part of. The presence of such statements does not make a legislative enactment unchallengeable and their absence does not automatically doom legislation as unconstitutional. Rather, in either case, a defendant governmental entity bears a heavy burden of demonstrating a legitimate governmental interest and an adequate factual foundation. *Young v. American Mini Theatre*, 427 U.S. at 62–63, 96 S.Ct. at 2448. In the present case, the defendants have met that heavy burden.

As the Court noted in its Findings of Fact, in enacting Ordinance 14.-02(C), Warren was acting to protect the quality of residential life in its community. This is a sufficiently important governmental interest to justify passage of the Ordinance. *Id.* Moreover, accepting this fact, it is not for this Court to look behind that purpose in order to search out an alleged improper motive.

It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. As the Court long ago stated:

"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary must restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." *McCray v. United States*, 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904).

*United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968).

This is especially true in cases such as this where it is clear that the permissible principle motivating factor would have led to the legislation's enactment apart from any other asserted purpose.

Having concluded that Warren sought to vindicate a legitimate and constitutionally sufficient governmental interest, the Court must also content itself that an adequate factual basis exists to support the legislative purpose. For if no factual basis exists to support Warren's belief that adult uses adversely affect residential areas, Ordinance 14.02(C) must fail. In this regard, the plaintiffs argue that the testimony of Dr. Bryant and Mr. Luedtke, discussed earlier, is irrelevant and inadmissible because it was not before the Warren City Council on the various occasions when Ordinance 14.02(C) was amended. Nevertheless, the Court finds that this testimony is relevant within the meaning of Federal Rule of Evidence 401 and that its admission is consistent with the principles announced in *Young* and *O'Brien*. More importantly, the Court finds that the defendants have shown an adequate factual basis to justify Ordinance 14.02(C).

Federal Rule of Evidence 401 states that

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

In the case now before the Court, the testimony of Dr. Bryant and Mr. Luedtke is directly relevant to the question of whether a rational factual basis existed and exists presently for Warren's belief that it needs to regulate adult uses in order to protect the quality of life in its community.

The admission of the testimony of Dr. Bryant and Mr. Luedtke is also consistent with the Supreme Court's decisions in *Young* and *O'Brien*. Applied to this case, the second and third *O'Brien* factors require that Warren be able to demonstrate the existence of a compelling governmental interest and a factual basis for that finding. As the Court has noted, an underlying factual basis for Ordinance 14.02(C) was a belief that adult uses need to be regulated because they have an adverse impact on residential areas. The testimony

of Dr. Bryant and Mr. Luedtke demonstrated the validity of this assumption.

As the Court noted in its Findings of Fact, the two existing adult uses in Warren have unquestionably blighted the residential areas to which they are adjacent. If allowed to open, the proposed adult uses would have a similar impact on the neighborhoods which they are surrounded by. Nevertheless, it is clear that such urban deterioration can be avoided relatively easily. Mr. Luedtke's testimony clearly established that if adult uses are physicially separated from residential uses, much in the same way industrial areas are separated from residential areas, the urban deterioration caused by the contact of these incompatible land uses can be minimized.

■■■■ The fact that Warren did not conduct detailed hearings into these issues does not make the legislative assumptions incorrect. Similarly, that the testimony of Mr. Luedtke and Dr. Bryant was not presented to the Warren City Council does not make it any the less accurate. The Court does believe, however, that such *post hoc* justifications should be considered suspect. The Court must be certain that the proffered reasons are not pretextual. Nevertheless, the Court finds that even viewed as such and in light of the "close scrutiny" standard of review which Ordinance 14.02(C) is subject to, the factual basis for the Ordinance withstands constitutional scrutiny.

■■■■ Finally, the Court will note that it believes that a city need not wait for urban deterioration to occur before acting to remedy it. The Court also believes that one city may rely upon the sociological experiences of other cities in enacting legislation so long as that reliance is not unreasonable. *C.L.R. Corp. v. Henline*, 702 F.2d 637 (6th Cir.1983). As the Court noted in *Genusa v. City of Peoria*, 619 F.2d 1203, 1211 (7th Cir.1980),

"Even though here, unlike *Young*, the city has not demonstrated a past history

of congregated adult uses causing neighborhood deterioration, we agree with the district court that a city need not await deterioration in order to act. A legislative body is entitled to rely on the experience and findings of other legislative bodies as a basis for action. There is no reason to believe that the effect of congregated adult uses in Peoria is likely to be different than the effect of such congregations in Detroit...."

In conclusion, the Court finds that a constitutionally sufficient justification and factual basis supports Ordinance 14.02(C).

### 3. *Minimal Interference*

The final criterion which *O'Brien* requires this Court to consider is whether the restrictions placed on First Amendment freedoms by Ordinance 14.02(C) are no greater than is essential to furthering Warren's interest in protecting its residential areas. Having carefully examined the spatial requirements of Ordinance 14.02(C) and the evidence presented to the Court in this case, the Court concludes that the 1000 feet and 500 feet requirements are permissible but that the major thoroughfare requirement is impermissible.

■■■■ Although the Warren Ordinance here in question differs from the Detroit Ordinance in *Young* in that it permits only one adult use every 1000 feet, as opposed to two, the Court is persuaded that this difference does not require invalidation. In short, the Court finds this requirement to be sufficiently justified and acceptable under *Young*. *Young v. American Mini Theatre*, 427 U.S. at 62–63, 96 S.Ct. at 2448. Unlike *Young*, however, the Court also finds the 500 feet restriction in this case to be sufficiently justified.[20] The evidence in this case unambiguously demonstrated the need to physically separate adult uses from residential areas in order to protect the quality of life in Warren. Moreover, the evidence in this case is that

---

**20.** The District Court in *Nortown Theatre v. Gribbs*, 373 F.Supp. 363, 369 (E.D.Mich.1974), found the 500 feet requirement unconstitutional. That ruling was not appealed and not considered by the Supreme Court in *Young*, 427 U.S. at 52 n. 2, 96 S.Ct. at 2444 n. 2.

the minimum distance which adult uses must be separated from residential areas in order to protect the residential areas is 500 feet.

■■■ Nevertheless, the defendants made no arguments as to how the major thoroughfare requirement furthers Warren's interest in preserving the quality of life in its residential areas. So long as a proposed use satisfies the 500 feet and 1000 feet spatial requirements, the Court fails to see how any additional protection is provided residential areas by locating proposed uses on major thoroughfares as opposed to other types of roads. At a minimum, this requirement is redundant and unnecessary. Therefore, the Court concludes that the major thoroughfare requirement serves no compelling governmental interest and is unconstitutional under the Equal Protection Clause of the Federal Constitution. Accordingly, Warren is hereby enjoined from enforcing the major thoroughfare requirement of Ordinance 14.02(C).

### 4. *Free Exchange of Ideas*

■■■ As the Supreme Court noted in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the challenge to the Detroit Ordinance in that case did not involve a claim that the Ordinance restricted the free exchange of ideas.

The ordinances are not challenged on the ground that they impose a limit on the total number of adult theaters which may operate in the City of Detroit. There is no claim that distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained. *Id.* at 62, 96 S.Ct. at 2448.

The plaintiffs in this case before this Court, however, do make such an argument. The plaintiffs argue that Ordinance 14.02(C) is invalid because it severely limits the availability, for public dissemination, of protected adult speech. Accordingly, as noted earlier, the plaintiffs and defendants introduced into evidence substantial testimony pertaining to this issue.

While the Court recognizes that such a claim may be a legitimate concern in appropriate cases, the claim fails in this case in light of the Court's earlier finding that at least 178 potential adult use sites exist in Warren given the spatial requirements of Ordinance 14.02(C). Even recognizing that this number will necessarily diminish as adult uses locate on these sites and the 1000 feet restriction comes into play, a sufficient number of sites exist to allow the plaintiffs now before the Court, as well as other future adult uses, to locate in Warren.

Justice Powell's poignant remarks on this issue in *Young* are equally relevant in this case.

In this case, there is no indication that the application of the Anti-Skid Row Ordinance to adult theaters has the effect of suppressing production of or, to any significant degree, restricting access to adult movies. Nortown concededly will not be able to exhibit adult movies at its present location, and the ordinance limits the potential location of the proposed Pussy Cat. The constraints of the ordinance with respect to location may indeed create economic loss for some who are engaged in this business. But in this respect they are affected no differently from any other commercial enterprise that suffers economic detriment as a result of land-use regulation. The cases are legion that sustained zoning against claims of serious economic damage. See, e.g., *Zahn v. Board of Public Works*, 274 US 325, 71 L Ed 1074, 47 S.Ct. 594 (1927).

The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression. This prompts essentially two inquiries: (i) Does the ordinance impose any content limitation on the creators of adult movies of their ability to make them available to whom they desire, and

(ii) does it restrict in any significant way the viewing of these movies by those who desire to see them? On the record in this case, these inquiries must be answered in the negative. At most the impact of the ordinance on these interests is incidental and minimal. Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view them. The ordinance is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content. Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience. *Id.* at 77–79, 96 S.Ct. at 2456 (Powell, J., concurring).

 While it would be unconsitutional for a municipality to zone adult uses into swamps, warehouses, or shipyards, where there are few access roads and where the locations are poorly lit and perhaps unsafe, *Basiardanes v. City of Galveston,* 682 F.2d 1203 (5th Cir.1982), the evidence in the case does not show a deliberate attempt to zone adult uses into a set of commercially impracticable sites. The fact that a plaintiff may not be able to afford renovation or construction costs does not persuade the Court that Ordinance 14.02(C) is invalid. For although Warren may not constitutionally act to ensure the commercial failure of adult uses, it is not required to ensure their success.

D. *Severablility*

 In the instant case, the Warren Zoning Ordinance contains a severability clause which provides "[i]f any part, sentence, paragraph, section or clause is adjudged unconstitutional or invalid, it is hereby provided that the remainder of the ordinance shall not be affected thereby." Recognizing this provision, and accepting that the Court must follow a rule of partial invalidity in this case, *Brockett v. Spokane Arcades, Inc.,* — U.S. —, 102 S.Ct. 2794, 86 L.Ed.2d 394 (1985), the Court hereby enjoins Warren from enforcing only those portions of the Warren Zoning Ordinance heretofore declared unconstitutional.

## CONCLUSION

Accordingly, the Court hereby enjoins the City of Warren and its agents from enforcing the special land use approval procedure and site plan review procedure of Section 14.02(C) and from enforcing Sections 22.14 and 22.16 of the Warren Zoning Ordinance. Additionally, the City of Warren and its agents are enjoined from enforcing the major thoroughfare requirement of Section 14.02(C) of the Warren Zoning Ordinance. The remaining provisions of Ordinance 14.02(C), particularly the 1000 feet and 500 feet spatial requirements, are hereby declared to be constitutionally sound.

IT IS SO ORDERED.