10 F.3d 123
 Francis R. MITCHELL; Bob's Discount Adult Books, Inc., Appellants,
v.
COMMISSION ON ADULT ENTERTAINMENT ESTABLISHMENTS OF the
STATE OF DELAWARE; Charles M. Oberly, III; Commissioners
of the Commission on Adult Entertainment Establishments of
the State of Delaware, an entity within the State of
Delaware, Department of Administrative Services, Division of
Business and Occupational Regulation, in their official
capacities; Secretary, Delaware Department of Health &
Social Services, an entity within the State of Delaware, in
his official capacity; Delaware Department of Health &
Social Services, an entity within the State of Delaware, Appellees.
 No. 92-7508.
 United States Court of Appeals,
Third Circuit.
 Argued June 22, 1993.
Decided Nov. 24, 1993.
 
 Lewis H. Robertson (argued), Evans, Osborne & Kreizman, Red Bank, NJ, for appellants.
 James J. Hanley (argued), John K. Welch, Kevin R. Slattery, Dept. of Justice, Wilmington, DE, for appellees.
 Present: STAPLETON, MANSMANN and HUTCHINSON, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellants Francis R. Mitchell ("Mitchell") and Bob's Discount Adult Books, Inc. (collectively "Adult Books") appeal an order of the United States District Court for the District of Delaware granting summary judgment in favor of appellees, Delaware's Attorney General Charles M. Oberly, III, the Secretary of its Department of Health and Social Services, and the Commissioners of Delaware's Commission on Adult Entertainment Establishments (collectively "the Commission"). Adult Books claims that the 1991 amendments to the Delaware Adult Entertainment Establishments Act ("the Act"), Del.Code Ann. tit. 24, Secs. 1601-1635 (1987 & Supp.1992) are unconstitutional restrictions of speech protected by the First Amendment.[1] The 1991 amendments limit the hours during which adult entertainment establishments can be open and require such establishments to eliminate all closed booths from which patrons could view live and video entertainment in seclusion. The district court held that these amendments were constitutional content-neutral, time, place, and manner regulations. We will affirm.[2]
 
 I. Factual and Procedural History
 A.
 
 2
 Adult Books is a Delaware corporation which owns and operates an adult entertainment establishment at 174 South DuPont Highway in New Castle, Delaware. Mitchell is an officer, director, and the principal stockholder of Adult Books.
 
 
 3
 Adult Books' entertainment facility is located on the northbound side of South Dupont Highway, an eight-lane highway with a four-foot concrete barrier dividing the northbound and southbound lanes. Zoning laws limit Adult Books' property, as well as contiguous properties within two miles in either direction on the northbound side, to commercial use. Nearby are a Delaware State Police Barracks and a gasoline station. Directly across the highway from Adult Books is Midvale, a residential community. None of the Midvale residences front on South Dupont Highway, but some of them share their rear lot lines with the highway's southbound right-of-way line. No paths or walkways connect the northbound and southbound lanes of the divided highway.
 
 
 4
 Since March 1976, Adult Books has sold books, magazines, films, and novelties of an adult nature at retail and provided adult films and video presentations for viewing from within completely enclosed booths. It also provided enclosed booths for viewing live entertainment between March 1976 and December 1985, and again during the first half of 1991.
 
 
 5
 In 1977, the Delaware General Assembly adopted the Adult Entertainment Establishments Act. The Act defined "adult entertainment establishments" subject to the Act, imposed a requirement that persons who engage in the operation of such establishments first obtain a license and comply with certain other provisions, and established the Commission on Adult Entertainment Establishments to oversee compliance. The Act also provided criminal penalties for those who operate an adult entertainment establishment without a license or in contravention of the requirements of the Act. The Act defines "adult entertainment establishment" as:
 
 
 6
 any commercial establishment, business or service, or portion thereof, which offers sexually oriented material, devices, paraphernalia or specific sexual activities, services, performances or any combination thereof, or in any other form, whether printed, filmed, recorded or live....
 
 
 7
 Del.Code.Ann. tit. 24, Sec. 1602(2) (Supp.1992). The Act further provides that the term "adult entertainment establishment" shall include, but not be limited to, adult book stores, conversation parlors, adult shows or adult peep shows, adult motion picture theatres, and massage establishments. Id. Adult Books does not dispute the Act's application to its business; it has been properly licensed since the effective date of the Act.
 
 
 8
 This Court has previously upheld the constitutionality of the Act as originally enacted. See Mitchell v. Commission on Adult Entertainment Est. ("Mitchell I "), C.A. No. 86-5519 (3d Cir. Jan. 30, 1987), 1987 U.S.App. LEXIS 1917, reported as table case at 810 F.2d 1164 (not-for-publication op.). In Mitchell I we applied the test the Supreme Court set forth in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48, 106 S.Ct. 925, 928-29, 89 L.Ed.2d 29 (1986), and held that "[t]he licensing statute is content-neutral, since it aims not at the content of adult entertainment, but at the secondary effects associated with it, i.e., the commission of various sex-related crimes. In attempting to curb these secondary effects, the Act serves the government's substantial interest in 'the health, safety and welfare of the people of the State.' " Mitchell I, slip op. at 8-9.
 
 
 9
 On June 5, 1991, the Delaware General Assembly enacted Senate Bill No. 163 (the "closing-hours amendment") which added to Sec. 1625 of the Act a subsection restricting the operating hours of adult entertainment establishments to the hours between 10:00 a.m. and 10:00 p.m. Monday through Saturday and requiring them to remain closed on all Sundays and legal holidays. The Delaware General Assembly also enacted Senate Bill No. 164 (the "open-booth amendment") which amended the Act by adding Sec. 1633(b). Section 1633(b) prohibits booths used for the viewing of motion pictures or other forms of entertainment in adult entertainment establishments from having doors unless one side is open to an adjacent public room so that the area inside is visible to persons in that adjacent room.[3]
 
 
 10
 Before enactment of the 1991 amendments, Adult Books served about 200-500 patrons per day. Its business hours were typically from 10:00 a.m. until 3:00 a.m. on Monday through Saturday, and from 10:00 a.m. until 2:00 a.m. on Sunday. On Christmas Eve it closed at 6:00 p.m. and remained closed until 10:00 a.m. on the day after Christmas. It also closed at 6:00 p.m. on New Year's Eve. According to Mitchell, it was busiest on weekends and holidays. On any given day, patronage became heavier after the end of the work day and steadily increased through the early morning hours. On a number of occasions, Adult Books had to ask patrons to leave at the 3:00 a.m. closing time. There has been only one criminal complaint or recorded incident about a patron's conduct outside Adult Books' business premises. In it, one patron complained that another had assaulted him in the parking lot and stolen his wallet.
 
 
 11
 Before the 1991 amendments, Adult Books offered both live and video performances for viewing from enclosed booths. A patron who wanted to use the booth deposited tokens to gain access. Each booth had a door that let the patron screen out unwanted light, noise, and other distractions and afforded privacy to those who would otherwise be too ashamed or inhibited to view a sexually explicit performance while others watched or observed.
 
 
 12
 Since enactment of the 1991 Amendments, Adult Books has limited its hours of operation and has removed the doors of its booths to comply with the Act. Based upon a comparison of revenues, Adult Books estimates that these two new restrictions have caused patronage to decrease to one-third or one-fourth its previous level. Mitchell and Adult Books did not produce any cash receipt entries for January through December 1991 in support of the alleged decrease in patronage. In response to the Commission's amended request for production of documents, Mitchell stated that he maintains no token counts for individual booths, nor any daily cash worksheets showing token counts for the booths.
 
 
 13
 The express purpose of the open-booth amendment was to prevent high-risk sexual contact. Adult Books therefore asked the Commission to rule that booths equipped with doors that would conceal a patron's head, arms and torso but expose his legs would comply with the new open-booth requirement. According to Adult Books, this kind of a door would serve the purpose of the open-booth amendment by revealing whether more than one person was in the booth and still meet the viewer's desire for privacy. The Secretary of the Delaware Health and Social Services Department notified Adult Books, by letter dated August 12, 1991, that " 'Dutch doors,' saloon style swinging doors, and doors with a 24-inch plexiglass panel at the bottom are not 'open to an adjacent public room,' " as the text of the open-booth amendment requires. Appellants' Appendix ("App.") at 249-50.
 
 B.
 
 14
 Adult Books filed a claim under 42 U.S.C.A. Sec. 1983 (West 1981) seeking a declaratory judgment that both the closing-hours and the open-booth amendments were unconstitutional. It also sought a temporary restraining order ("TRO") and a preliminary injunction against their enforcement.
 
 
 15
 The district court denied Adult Books' application for a TRO, holding that it was unlikely to succeed on the merits. Adult Books then withdrew its motion for a preliminary injunction. Later, Adult Books amended its complaint to add the Delaware Department of Health and Social Services as a defendant, alleging that the Department was the state agency with authority to enforce the Act. Both Adult Books and the Commission moved for summary judgment.
 
 
 16
 On August 27, 1992, the district court granted the Commission's motion for summary judgment holding that both the closing-hours and open-booth requirements were constitutional. Mitchell v. Commissioners of Comm'n on Adult Entertainment Est., 802 F.Supp. 1112, 1126 (D.Del.1992) ("Mitchell II "). On September 17, 1992, Mitchell and Adult Books filed a timely notice of appeal.
 
 II. Jurisdiction and Standard of Review
 
 17
 The district court had subject matter jurisdiction over Adult Books' action alleging violations of 42 U.S.C.A. Sec. 1983 (West 1981) and the First and Fourteenth Amendments to the United States Constitution under 28 U.S.C.A. Secs. 1331 and 1343(a)(3), (4) (West 1993). We have appellate jurisdiction under 28 U.S.C.A. Sec. 1291 (West 1993) over Adult Books' timely appeal from the final decision of the district court granting summary judgment in favor of the Commission.
 
 
 18
 A district court's grant of summary judgment is subject to plenary review. Public Interest Research of N.J. v. Powell Duffryn Terminals, Inc., 913 F.2d 64 (3d Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).III. Overview of First Amendment Jurisprudence
 
 
 19
 The United States Supreme Court has afforded First Amendment protection to sexually explicit non-obscene[4] films, live presentations, and printed matter. See, e.g., Barnes v. Glen Theatre, Inc., --- U.S. ----, ----, 111 S.Ct. 2456, 2463, 115 L.Ed.2d 504 (1991) (live nude dancing in adult bookstore and nightclub); Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (live nude dancer in adult book store); Erznoznik v. City of Jacksonville, 422 U.S. 205, 211-12, 95 S.Ct. 2268, 2273-74, 45 L.Ed.2d 125 (1975) (motion pictures portraying nudity); Kois v. Wisconsin, 408 U.S. 229, 231-32, 92 S.Ct. 2245, 2246-47, 33 L.Ed.2d 312 (1972) (sexually explicit poetry). In Barnes, however, a plurality of the Supreme Court concluded that the First Amendment's guarantee of free expression only "marginally" protects nude dancing. Barnes, --- U.S. at ----, ----, 111 S.Ct. at 2460, 2463. In a case challenging a local zoning ordinance that required adult theatres to be dispersed and not concentrated in limited zones, the Court has also stated:
 
 
 20
 [E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment.[5]
 
 
 21
 Young v. American Mini Theatres, Inc., 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (footnote added). In Young, a plurality of the Supreme Court held that even though such sexually explicit films are protected from total suppression, "the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures." Id. at 70-71, 96 S.Ct. at 2452. "Even within the area of protected speech, a difference in content may require a different governmental response." Id. at 66, 96 S.Ct. at 2450. Thus, the Supreme Court has indicated that some sexually explicit material may be only marginally protected.
 
 
 22
 Nevertheless, if the regulation of sexually explicit materials is aimed primarily at suppression of First Amendment rights, then it is thought to be content-based and so presumptively violates the First Amendment. See Renton, 475 U.S. at 46-48, 106 S.Ct. at 928-29. But if the regulation's predominate purpose is the amelioration of socially adverse secondary effects of speech-related activity, the regulation is content-neutral and the court must measure it against the traditional content-neutral time, place, and manner standard. See Barnes, --- U.S. at ----, 111 S.Ct. at 2460; Renton, 475 U.S. at 46-48, 106 S.Ct. at 928-29; Young, 427 U.S. at 70-72, 96 S.Ct. at 2452-53. Under Renton, reasonable time, place, and manner regulations of protected speech are valid if: (1) they are justified without reference to the content of the regulated speech; (2) they are narrowly tailored to serve a significant or substantial government interest;[6] and (3) they leave open ample alternative channels of communication.[7] Renton, 475 U.S. at 47-48, 106 S.Ct. at 928-29; see also Ward v. Rock Against Racism, 491 U.S. 781, 789-91, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); Young, 427 U.S. at 63 n. 18, 96 S.Ct. at 2449 n. 18. As the amendments are directed at curbing the side effects of Adult Books' speech-related activity, we judge this case under Renton, as did the district court, and will separately analyze both the closing-hours amendment and the open-booth amendment under its three-part test, considering first the closing-hours amendment.
 
 IV. Closing-Hours Requirement--Sec. 1625(b)
 The Act provides:
 
 23
 Sec. 1625. Rules and prohibitions relating to adult entertainment establishments.
 
 
 24
 * * * * * *
 
 
 25
 (b) No adult entertainment establishment shall open to do business before 10:00 a.m., Monday through Saturday; and no adult entertainment establishment shall remain open after 10:00 p.m., Monday through Saturday. No adult entertainment establishment shall be open for business on any Sunday or a legal holiday as designated in Sec. 501 of Title 1.
 
 
 26
 Del.Code Ann. tit. 24, Sec. 1625(b) (West Supp.1992) (effective July 9, 1991).[8]
 
 A. Content Neutrality
 
 27
 "The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791-93, 109 S.Ct. at 2754 (citing Clark v. Community for Creative Non-Violence, 468 U.S. 288, 295, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984)). Content-neutral speech regulations must be "justified without reference to the content of the regulated speech." Renton, 475 U.S. at 48, 106 S.Ct. at 929 (quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)) (emphasis in original). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S.Ct. at 2754. In Renton, the Supreme Court looked to the predominate concern of the city council in passing the enactment and stated that if an ordinance does "not ban adult theatres altogether,"[9] but merely bans them from some parts of the city, it is properly analyzed as a form of time, place, and manner regulation. Renton, 475 U.S. at 46, 106 S.Ct. at 928.
 
 
 28
 Adult Books argues that these amendments are content-specific because they affect speech directly, not just incidentally, and are aimed only at adult entertainment establishments. Adult Books concedes that if the predominate concern of the legislature in enacting the closing-hours and open-booth amendments was the adverse secondary effects of its speech-related activity, the regulation must be analyzed as a reasonable time, place, or manner restriction. The Commission responds that both amendments are aimed primarily at curbing adverse secondary effects of adult entertainment establishments and the nuisance-like disruptive activity they occasion in residential areas. The state must also be prepared, however, to articulate and support its argument with a reasoned and substantial basis demonstrating the link between the regulation and the asserted governmental interest. See Schad, 452 U.S. at 69-70, 101 S.Ct. at 2183-84; id. at 77, 101 S.Ct. at 2187 (Blackmun, J., concurring).
 
 
 29
 Thus, Adult Books does not appear to question the legislature's intent that the closing-hours amendment serves a substantial governmental interest. Instead, Adult Books argues that the legislature did not have an adequate factual basis to support its conclusion that the asserted undesirable secondary effects it seeks to regulate resulted from the protected activity or, if it did, that the closing-hours amendment would reduce them. Because the closing-hours amendment was passed without adequate factual support, Adult Books says it is presumptively content-specific and so unconstitutional. Adult Books' argument is reminiscent of one the Supreme Court rejected in Renton, a case that involved a zoning ordinance regulating the location of adult motion picture theaters. In Renton, the Supreme Court held that a city enacting an adult theatre zoning ordinance is entitled to rely on the experiences, evidence and studies of other cities enacting similar ordinances. Renton, 475 U.S. at 50, 51, 106 S.Ct. at 930, 931. In so holding, the Supreme Court specifically rejected the idea that the government need produce its own studies or independent evidence to justify its conclusions.[10] Id.
 
 
 30
 There is no evidence that the legislature adopted the closing-hours amendment because of disagreement with the message the speech conveys. See Ward, 491 U.S. at 791-94, 109 S.Ct. at 2754-55. The closing-hours amendment only limits adult entertainment establishments' hours of operation to twelve hours per day excluding Sundays and legal holidays. It does not affect the content of speech directly, but only incidentally for the avowed purpose of decreasing traffic congestion, parking problems, the performance of sexual acts in public, and the littering of discarded sexually explicit materials near residential communities. See Renton, 475 U.S. at 48, 106 S.Ct. at 929. Furthermore, it appears that the content of the sexually explicit speech and expressive activity that businesses like Adult Books purvey permits legislative bodies to put adult entertainment establishments in a different category than other entertainment establishments. See Young, 427 U.S. at 70-71, 96 S.Ct. at 2452. In determining whether a legislative enactment meets the threshold test of content neutrality, courts typically look only to the predominate concern of the enacting body. Renton, 475 U.S. at 48, 106 S.Ct. at 929. Whether the asserted government interest is proper and adequately supported is usually analyzed in terms of whether the enactment is narrowly tailored to achieve this interest, the second prong of the Renton test. See Renton, 475 U.S. at 49-51, 106 S.Ct. at 929-31. Therefore, we conclude that the closing-hours amendment is content-neutral in nature, and turn now to analysis of whether it is narrowly tailored. This, the second prong of Renton's tripartite test, itself has two parts.
 
 
 31
 B. Narrowly Tailored to Serve Substantial Governmental
 
 Interest
 
 32
 We will first discuss the sufficiency of the asserted governmental interest and then consider the other edge of Renton's second double edged prong--whether the regulation is narrowly tailored to serve that interest.
 
 1. Substantial Government Interest
 
 33
 The Supreme Court has recognized that a state's interest in preserving the character and preventing the deterioration of its neighborhoods adequately supports restrictions on adult entertainment establishments. See Young, 427 U.S. at 71, 96 S.Ct. at 2452; see also Renton, 475 U.S. at 50, 106 S.Ct. at 930 (city or state's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect") (quoting Young, 427 U.S. at 71, 96 S.Ct. at 2452). We have already concluded that the closing-hours amendment can be justified if it is intended to reduce the undesirable secondary effects of adult entertainment establishments and to promote the welfare of the community's neighborhoods; however, before passing Senate Bill 163 embodying the amendment, the full Senate received no documents nor any sworn testimony in support of the bill.[11] In addition, the General Assembly did not conduct public hearings at which adult entertainment establishments could have voiced their concerns and views, nor did it undertake an official study to determine how the licensed establishments' operating hours affect the welfare of the neighborhoods. Cf. Star Satellite, Inc. v. Biloxi, 779 F.2d 1074, 1077 (5th Cir.1986) (ordinance adopted after extensive study by City including committee recommendations and public hearings). Therefore, Adult Books argues that pre-enactment factual support for the legislation was insufficient.
 
 
 34
 Under Renton, a city or state may rely heavily on the experience of, and studies produced by, other cities and states, as well as on court opinions from other jurisdictions. See Renton, 475 U.S. at 50-51, 106 S.Ct. at 930-31. In Renton, the Court held that the city could rely upon the opinions expressed in court decisions of other jurisdictions to establish that the location of adult entertainment establishments has a harmful effect on an area, and thus, an important governmental interest justifying its passage. Id. at 51, 106 S.Ct. at 931. But Renton also requires the legislative body to rely upon the evidence of incidental adverse social effect that provides the important governmental interest justifying reasonable time, place and manner restrictions on speech or expressive conduct. As we have seen in our analysis of Renton's threshold test of content neutrality, these adverse effects must be the legislature's predominate purpose in enacting the incidental restriction the statute imposes. Id. at 51-52, 106 S.Ct. at 930-31.
 
 
 35
 The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.
 
 
 36
 Id. In Renton, therefore, the Supreme Court noted that the "detailed findings" summarized in another state's court opinion were before Renton's City Council when it passed its ordinance. Id. at 51, 106 S.Ct. at 931. Logically, reliance on the governmental purpose of ameliorating the adverse effects of marginally protected speech or expressive activity presupposes knowledge of them. Adult Books' argument that Renton is distinguishable therefore seems to be based on the premise that reliance can only be shown by pre-enactment evidence that the legislature knew about the adverse effects which supply the required substantial government interest and therefore considered or relied on these effects in the law's enactment. Adult Books points out that the Delaware Senate had no evidence of adverse incidental effects before it prior to the passage of Senate Bill No. 163 other than the conclusory statements of its sponsor, while other cities and localities whose incidentally restrictive enactments have been judicially upheld against constitutional attack had before them more or less elaborate studies about the adverse incidental effects of the activities they sought to regulate when enacting such legislation. See, e.g., 11126 Baltimore Blvd. v. Prince George's Cty., Md., 886 F.2d 1415, 1423 (4th Cir.1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990); SDJ, Inc. v. City of Houston, 837 F.2d 1268, 1274 (5th Cir.1988), cert. denied sub nom., M.E.F. Enter. v. Houston, 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).
 
 
 37
 The district court acknowledged that the General Assembly "considered the relationship between sexually-oriented businesses and their effects on the surrounding communities" "in a cursory fashion" and observed that "the record is not replete with pre-enactment evidence to support the challenged regulations." Mitchell II, 802 F.Supp. at 1120. Nevertheless, it held that there were sufficient facts before the Delaware Senate when it enacted Senate Bill No. 163 to satisfy Renton.
 
 
 38
 As pre-enactment evidence, the Senate had before it a synopsis of the Bill and a statement by its chief sponsor. The synopsis to Senate Bill No. 163, accompanying Sec. 1625, specifically stated:
 
 
 39
 This Act provides certain time restrictions for adult entertainment establishments. In addition, this Act limits the operation of adult entertainment establishments to the hours of 10:00 a.m. and [sic] 10:00 p.m. Mondays through Saturdays; it requires such business to remain closed on Sundays and holidays.
 
 
 40
 Courts have upheld such time restrictions, and found that they may, in fact, further a significant community interest in promoting the welfare of a community's neighborhoods. One court [Star Satellite] noted that such time restrictions, which permit an adult entertainment establishment to remain open fourteen hours per day, six days per week, did not suppress or ban sexually-explicit materials from the community, and were not manifestly arbitrary.
 
 
 41
 Mitchell II, 802 F.Supp. at 1115. Senator McBride, the sponsor of the legislation, explained the rationale of Senate Bill No. 163 to the Senate as follows:
 
 
 42
 Senate Bill No. 163 is an attempt ... by legislators from affected areas and others to allow the citizens in their community, if you will, to recapture their community. The adult entertainment establishments, particularly ones in my Senatorial District and nearby, unfortunately, were put into place and established before the adult entertainment laws were re-written by myself, Representative Spence and others back in the early '80s and in several cases they abut residential communities. In fact, our neighbors, if you will, of residential homes where families (inaudible)[12] the establishments have become an absolute nuisance to the community in the form of additional traffic and many, many other activities that take place unfortunately in the area because of these establishments. This bill before us now attempts to regulate, if you will, the hours of operation from in the morning until 10:00 p.m. to be closed Sundays and on legal holidays. We believe that while the law allows these establishments to operate, we believe that we also have a right to set some reasonable hours of operation so that the neighborhoods can get some peace and quiet at least part of the day. If there are any questions, I have with us today a gentleman from the Delaware State Police who has worked very closely with us on these matters and I would like to thank the State Police for their help.
 
 Id. at 1116 (footnote renumbered).[13]
 
 43
 After the district court determined that Senator McBride's statement, coupled with the synopsis, was sufficient to demonstrate that Delaware's Senate passed Senate Bill 163 to regulate the undesirable incidental effect that the expressive activity of an establishment like Adult Books has on the community, it permitted the state to submit supplemental materials about the need for Senate Bill No. 163. We think the district court was justified in finding that the synopsis of the amendment, referring to other jurisdictions' recognition and treatment of the problem, coupled with Senator McBride's statements and his willingness to put forth testimony from the State Police, was pre-enactment evidence of need and effect sufficient to justify the district court's further consideration of the Commissioners' post-enactment deposition testimony.[14] Therefore, the district court's use of this post-enactment evidence was proper. See 11126 Baltimore Blvd., 886 F.2d at 1425 ("[C]ourts have routinely admitted evidence at trial to supplement a legislative record or explain the stated interests behind challenged regulations. It would appear from reviewing the Renton case, for example, that testimony of this nature was admitted at trial and considered on appeal."), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990); 15192 Thirteen Mile Road, Inc. v. City of Warren, 626 F.Supp. 803, 816-17 (E.D.Mich.1985); cf. Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia, 6 F.3d 990, 1003 (3d Cir.1993) (recognizing that several courts have held post-enactment evidence admissible in determining whether an ordinance with racial classifications meets Equal Protection Clause). But see 15192 Thirteen Mile Road, 626 F.Supp. at 825 (taking trial testimony into account in considering legislative intent underlying statute, but dictating that such post hoc justification should be considered suspect).
 
 
 44
 The ordinance upheld in Star Satellite, like Delaware's closing-hours amendment, limited adult bookstores to the hours of 10:00 a.m. to 12:00 midnight, Mondays through Saturdays, and required them to remain closed on Sundays.[15] Star Satellite, 779 F.2d at 1077, 1079.[16] Factual support for the need and effect of the ordinance in Star Satellite was somewhat stronger than that which the Senate of Delaware had before it prior to enactment of the closing-hours amendment in question in this case. In Star Satellite, a committee appointed by the mayor had conducted an extensive study and held three public hearings during which citizens raised a number of concerns and problems allegedly caused by the regulated establishments. See Star Satellite, 779 F.2d at 1077-78. In evaluating the importance of the governmental interest justifying a particular ordinance that incidentally restricts speech in order to curb the adverse effects of marginally protected activity, we do not think a court must close its eyes to evidence that has been presented and considered in other similar cases.
 
 
 45
 When the First Amendment protection afforded the expressed activity is only "marginal," Barnes, --- U.S. at ----, ----, 111 S.Ct. at 2460, 2463, some courts have attenuated the requirement of pre-enactment legislative evidence of the undesirable side effects of expressive activity and a reasonable likelihood that the proposed bill will reduce them by adopting a "legislative notice" theory that is said to be analogous to the concept of judicial notice. See Wall Distrib., Inc. v. City of Newport News, 782 F.2d 1165, 1169 n. 7 (4th Cir.1986) (adopting "legislative notice" theory which allows legislative bodies to take notice or assume matters of common knowledge and experience); see also Postscript Enter. v. City of Bridgeton, 905 F.2d 223, 226-27 (8th Cir.1990) (upholding legislation restricting operations of adult movie arcade based on Wall Distributors theory of legislative notice). Justice Souter's concurring opinion in Barnes also suggests a diminished need for pre-enactment evidence. See Barnes, --- U.S. at ----, 111 S.Ct. at 2470 (Souter, J., concurring) ("In light of Renton's recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects.... I do not believe that a State is required to undertake to litigate this issue repeatedly in every case.").
 
 
 46
 Here, it is unnecessary for us to reach or decide whether the doctrine of legislative notice of the incidental activities common to adult book stores can save a statute passed without any pre-enactment evidence of need and purpose. See Lakeland Lounge v. City of Jackson, Mississippi, 973 F.2d 1255, 1258 n. 1 (5th Cir.1992) (recognizing, but not reaching, argument that in light of Renton and Barnes, legislative findings may no longer be necessary in addressing certain problems of national concern), cert. denied, --- U.S. ----, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993). The Delaware legislature had before it some basis for deciding the closing-hours amendment was needed to curb the unwanted incidental effects of businesses like Adult Books. This basis included the amendment's stated purpose, Senator McBride's statements to the General Assembly including his reference to the fact that a state police officer was on hand to provide supporting testimony, and experiences of other jurisdictions concerning such restrictions.
 
 
 47
 The question remains, however, whether the pre-enactment and post-enactment evidence, taken together, were sufficient to show that the legislature's predominate purpose in passing the closing-hours amendment was regulation of the incidental effects of the activities of establishments like Adult Books and that those effects involved a substantial governmental interest. After passage of Senate Bill No. 163, Pasqualine Robison, one of the members of the Commission and a resident of Midvale, testified that before the passage of Senate Bill No. 163 she had discussed with Senator McBride the various problems adult entertainment establishments in that community cause including noise, traffic congestion, parking problems and the performance of sexual acts in public places. Mitchell II, 802 F.Supp. at 1116. Joann Christian, another member of the Commission, also a resident of Midvale, testified that she too had discussed with Senator McBride problems of noise, excessive parking, and the presence of discarded sexually oriented material on residential lawns that adult entertainment establishments cause. Id. Ms. Christian testified that she and Senator McBride had specifically considered curtailing the hours of adult entertainment establishments as a means of reducing these incidental problems. Id.
 
 
 48
 The pre-enactment evidence before the Delaware Senate was sufficient to show a proper purpose for the closing-hours amendment and, when coupled with the post-enactment supplemental evidence and the experience of other jurisdictions, amply demonstrated that the amendment was passed to control the socially undesirable effects incidental to the operation of adult entertainment establishments.
 
 
 49
 Thus, we believe the evidence on this record is sufficient to show Delaware had a substantial governmental interest in regulating the incidental adverse effects of Adult Books' speech-related activity and that its decision to impose the restriction the closing-hours amendment entails was for that purpose and not for the purpose of regulating the content of the sexually explicit speech or expressive activity Adult Books purveys. The perceived effects are akin to those created by a public nuisance. The operation of an establishment like Adult Books may have a place in our society but like the proverbial pig, it can be regulated out of the parlor and off the lawn.
 
 
 50
 In summary, we hold that the underlying governmental interest of Delaware's closing-hours amendment, which does not regulate or restrict the content of any speech, idea or expression, is supported by an adequate factual basis.[17]
 
 2. Narrowly Tailored Requirement
 
 51
 We must still address whether the closing-hours amendment is narrowly tailored to serve the substantial governmental interests that justify its enactment. See Renton, 475 U.S. at 47-48, 52, 106 S.Ct. at 928-29, 931; Ward, 491 U.S. at 789-91, 795-800, 109 S.Ct. at 2753, 2756-58. A restriction on speech or expressive activity is narrowly tailored if its effect on First Amendment freedoms is essential to further the governmental interest that justifies incidental interference with First Amendment rights in the first place. O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679. Generally, where the regulation affects content, the means chosen cannot be substantially broader than necessary to achieve the government's interest. Ward, 491 U.S. at 796-98, 109 S.Ct. at 2757. This "least restrictive means" analysis, however, does not apply when content-neutral time, place, and manner restrictions are at issue. Id., 491 U.S. at 796-800, 109 S.Ct. at 2757-58; see also New Jersey Citizen Action v. Edison Township, 797 F.2d 1250, 1255 (3d Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 186 (1987). Rather, such restrictions are "narrowly tailored" " 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " Ward, 491 U.S. at 799, 109 S.Ct. at 2758 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Moreover, when the potential for overbreadth burdens a category of speech, such as sexually-oriented expression, that enjoys less than the full First Amendment protection afforded to political debate, the cloth need not be cut quite so close. See Barnes, --- U.S. at ----, 111 S.Ct. at 2470 (Souter, J., concurring).
 
 
 52
 Still, the legislative cloak must be fitted so as to "affect only that category of [adult entertainment establishments] shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in Schad [, 452 U.S. at 63, 101 S.Ct. at 2179-80] and Erznoznik [, 422 U.S. at 213-14, 95 S.Ct. at 2274-75]." Renton, 475 U.S. at 52 [106 S.Ct. at 931]; see Tollis, Inc. v. San Bernardino County, 827 F.2d 1329, 1332-33 (9th Cir.1987) (county's predominant concern in prohibiting businesses purveying sexually explicit expressive materials within one thousand feet of any residential use or some other business and recreational uses with amelioration of secondary effects does not save ordinance interpreted to include any theater that showed a single sexually explicit adult movie).
 
 
 53
 Adult Books argues that its location on the northbound side of an eight-lane divided highway, without any residences on that side within two miles of it, and its practical inaccessibility to pedestrians preclude the closing-hours amendment's application to it because the amendment's purpose of abating late night noise levels, crime, and sexually offensive materials and activities in residential areas is lacking in Adult Books' particular case.
 
 
 54
 It is thus on the basis of its own particular location that Adult Books argues the closing-hours amendment is not narrowly tailored because it regulates the closing hours of all adult book stores, even those that can have none of the adverse effects on residential communities which justified the restriction in the first place. Adult Books points to Star Satellite in support of this argument. In that case, the challenged ordinance imposed different restrictions on residential and non-residential areas. See Star Satellite, 779 F.2d at 1077; cf. Young, 427 U.S. at 82, 96 S.Ct. at 2458 (Powell, J., concurring) ("The case would present a different situation had Detroit brought within the ordinance types of theatres that had not been shown to contribute to the deterioration of surrounding areas."). Adult Books' argument confuses the requirement that judicial resolution of individual disputes must be based on evidence material to the situation of the parties to the case with the requirement that a legislature seeking to restrict the time, manner or means of speech or expressive activity must show that it had a proper purpose.[18]
 
 
 55
 Renton indicates that a state legislature considering an ordinance or a statute designed to regulate the incidental undesirable effects of marginally protected expressive activity does not need to survey every adult book store in the state to determine the effect the statute or regulation will have on each. See Renton, 475 U.S. at 52, 106 S.Ct. at 931 (legislative restriction must be designed "to affect only that category of theatres shown to produce the unwanted secondary effects"). We think Renton leaves a legislative body free to classify and draw lines, provided it does not wholly or practically prevent access to the expressive material whose sale and distribution the ordinance or statute incidentally regulates.
 
 
 56
 Thus, we agree with the district court's conclusion that the state need not prove that Adult Books' particular ability to disseminate its materials needs restriction in order to prevent the undesirable impact on its neighbors that justified the closing-hours amendment. We think, rather, that it need only show that adult entertainment establishments as a class cause the unwanted secondary effects the statute regulates.[19]
 
 
 57
 In Renton, the Supreme Court also rejected an argument that a city had failed to prove narrow tailoring because it did not show its legislative decision to concentrate businesses that deal in sexually explicit material in a designated use zone was a better means of reducing their undesirable secondary effect than dispersing them throughout the city. Id. at 52-53, 106 S.Ct. at 931-32. Instead, it determined that the city's decision to concentrate establishments like Adult Books in one area was a legislative choice among competing means for which a court cannot substitute its own judgment. It stated:
 
 
 58
 It is not our function to appraise the wisdom of [the city's] decision to require adult theatres to be separated rather than concentrated in the same areas.... [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.
 
 
 59
 Id. at 52, 106 S.Ct. at 931 (quoting Young, 427 U.S. at 71, 96 S.Ct. at 2452) (plurality opinion) (brackets in original) (emphasis added). Delaware's decision to regulate the closing hours of adult book stores instead of concentrating them in a single area is also an appropriate exercise of the legislative power to choose a particular means to accomplish a legitimate legislative end. Because Delaware's closing-hours amendment promotes a substantial government interest that would be achieved less effectively absent the regulation, it meets the narrowly tailored requirement, the second prong of the Renton test, as it is applied to incidental time, place and manner regulation of marginally protected speech or expressive conduct.
 
 C. Alternative Channels of Communication
 
 60
 We come now to the final prong of the Renton test, as it applies to the closing-hours amendment. Adult Books argues that the closing-hours amendment does not leave open adequate alternative channels of communication because it prohibits adult entertainment during the time of greatest customer demand. It cites, by analogy, several cases in which courts have invalidated regulations prohibiting door-to-door canvassing after 5:00 p.m. or 8:00 p.m. for lack of adequate alternatives. See, e.g., New Jersey Citizen Action, 797 F.2d at 1260-62; City of Watseka v. Illinois Public Action Council, 796 F.2d 1547, 1557-58 (7th Cir.1986), aff'd, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987); Wisconsin Action Coalition v. City of Kenosha, 767 F.2d 1248, 1256, 1258 (7th Cir.1985); cf. Pennsylvania Alliance for Jobs & Energy v. Council of Munhall, 743 F.2d 182, 187-88 (3d Cir.1984). It is, of course, clear that "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 812, 104 S.Ct. 2118, 2132, 80 L.Ed.2d 772 (1984); New Jersey Citizen Action, 797 F.2d at 1261. We think, however, that Delaware's restriction on the hours during which businesses like Adult Books can operate leaves adequate alternative channels of communication open.
 
 
 61
 Under the closing-hours amendment adult book stores are free to operate six days per week for twelve hours per day Monday through Saturday, between 10:00 a.m. and 10:00 p.m., except on holidays. Even when the closing-hours amendment's weekday restrictions are coupled with the prohibition on their operations on sixty-four days of the year (fifty-two Sundays and twelve designated state holidays), the closing restrictions cannot be considered to suppress or unduly restrict the dissemination of sexually-explicit materials in that state. The amendment allows those who choose to hear, view or participate publicly in sexually explicit expressive activity more than thirty-six hundred hours per year to do so. We think the Constitution requires no more. See Star Satellite, 779 F.2d at 1079.
 
 
 62
 Because the third and final prong of the Renton test has been met, we have demonstrated that the closing-hours amendment meets all the Renton requirements. Accordingly, the district court did not err in upholding the closing-hours amendment against constitutional attack.
 
 V. Open-Booth Requirement--Sec. 1633(b)(2)
 
 63
 We will again, as with the closing-hours amendment, apply each of Renton's three tests to the open-booth amendment. With respect to viewing booths in adult entertainment establishments, the Act provides:
 
 
 64
 Sec. 1633. Building standards.
 
 
 65
 * * * * * *
 
 
 66
 (b) No person shall own, operate, manage, rent, lease or exercise control over any commercial building, structure, premises or portion or part thereof, which contains:
 
 
 67
 (1) Partitions between subdivisions of a room, portion or part of a building, structure or premises having an aperture which is designed or constructed to facilitate sexual activity between persons on either side of the partition; or
 
 
 68
 (2) Booths, stalls, or partitioned portions of a room or individual rooms, used for the viewing of motion pictures or other forms of entertainment, having doors, curtains or portal partitions, unless such booths, stalls, partitioned portions of a room or individual rooms so used shall have at least one side open to an adjacent public room so that the area inside is visible to persons in adjacent public rooms. Such areas shall be lighted in a manner that the persons in the areas used for viewing motion pictures or other forms of entertainment are visible from the adjacent public rooms, but such lighting shall not be of such intensity as to prevent the viewing of the motion pictures or other offered entertainment.
 
 
 69
 Del.Code Ann. tit. 24, Sec. 1633(b) (West Supp.1992) (effective July 9, 1991).
 
 A. Content Neutrality
 
 70
 Delaware's open-booth amendment does not ban films or other entertainment. It merely regulates the place where the viewing occurs. It is not directed at limiting the content of the films or performances patrons can view from within the booths, but rather at curbing the undesirable incidental effects that are perceived to result from the use of closed booths in adult entertainment establishments. These effects are thought to include the spread of AIDS and other communicable diseases through the unprotected, promiscuous sexual activity that can occur within the privacy of closed booths. The elimination or reduction of this adverse incidental effect of Adult Books' business of providing its patrons with sexually explicit materials appears to be a substantial governmental interest.
 
 
 71
 Adult Books, however, argues that the predominate purpose of the Legislature was to restrict the content of the films Adult Books offers for viewing by its patrons rather than to curb the unwanted secondary effects of making it available in closed booths. We reject that argument. In doing so, we note our agreement with the district court in Movie & Video World v. Board of Commissioners, 723 F.Supp. 695, 700 (S.D.Fla.1989). It reasoned:
 
 
 72
 The Plaintiff suggests that the legislature's true intent is, not to curb the "secondary effects," but rather to close the establishment and suppress the content of the films it offers for viewing. However, on its face the statute's stated reasons are to combat the possible spread of disease and to control crime. The record does not support any intention to suppress the content of the films themselves. Ordinance 88-31 does not ban the showing of sexually explicit videos and in no way limits access to or availability of such videos. It merely regulates the manner in which the films can be viewed. Additionally, the court will not strike down otherwise constitutional legislation on the basis of a "speculated illicit legislative motive."
 
 
 73
 Id. at 700 (citations omitted); see also Suburban Video, Inc. v. City of Delafield, 694 F.Supp. 585, 589 (E.D.Wis.1988).
 
 
 74
 The record in this case does not show that Delaware intended to suppress the content of any films. The Act and its amendments apply to all "adult entertainment establishments." They are defined as any "commercial establishment ... which offers sexually oriented material, devices, paraphernalia or specific sexual activities, services, performances or any combination thereof," Del.Code Ann. tit. 24, Sec. 1602(2) (Supp.1992), as well as massage parlors, conversation parlors, and call services which have no First Amendment protection. Cf. Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 940-42 (10th Cir.1987) (city's interest in regulating prostitution through ordinance prescribing dress code for massage parlors was unrelated to inhibiting freedom of expression).
 
 
 75
 Like the ordinance in Berg v. Health & Hospital Corp. of Marion County, Indiana, 865 F.2d 797, 802 (7th Cir.1989), Delaware's open-booth amendment
 
 
 76
 would apply to a showing of "Rebecca of Sunnybrook Farm" as well as any other film or performance. The [county ordinance regulating doors on individual entertainment enclosures] regulates only the non-communicative aspects relating to the environment in which such material may be disseminated or received, and thereby "imposes only an incidental burden" on plaintiffs' first amendment rights.
 
 
 77
 Id. at 802 (citation and internal quotations omitted); see also Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243, 1245-46 & n. 2 (9th Cir.1982) (city ordinance requiring that viewing booths be visible from continuous aisle regardless of type of film shown held content-neutral manner regulation). Like the closing-hours restriction, the open-booth amendment affects only the manner in which an expressive performance is viewed, not its substance. Therefore, we also review the open-booth amendment under the standards applicable to a content-neutral time, place, and manner regulation of expressive activity.
 
 
 78
 B. Narrowly Tailored to Serve Substantial Governmental
 
 Interest
 1. Substantial Government Interest
 
 79
 The purpose of Sec. 1633(b)(2), the open-booth requirement, as stated in the statute itself at Sec. 1631, is to "eliminate the possibility of the spread of, or infection by, communicable diseases." Del.Code Ann. tit. 24, Sec. 1631(a) (Supp.1992). It provides in more detail:
 
 
 80
 Sec. 1631. Statement of purpose; findings.
 
 
 81
 (a) It is hereby found that there are certain commercial premises, buildings, structures or parts thereof which, by reason of the design and use of such premises, buildings or structures are conducive to the spread of communicable disease to persons frequenting such premises, buildings and structures; and also to the public health, safety and welfare. The General Assembly declares that the health, safety and welfare of all persons in this State should be protected through the application and enforcement of standards regulating such premises, buildings and structures, in order to eliminate the possibility of the spread of, or infection by, communicable diseases.
 
 
 82
 (b) The sexually transmittable disease of Acquired Immune Deficiency Syndrome, currently found to be irreversible and uniformly fatal, is found to be of particular danger to persons who frequent adult entertainment establishments or other premises, when they are in violation of state law. A high incidence of this and other communicable diseases is found to occur in discernable population groups. The risk factors for obtaining or spreading A.I.D.S. are associated with high-risk sexual conduct. The commercial premises, buildings and structures where persons might place themselves at risk of infection from this disease, or from any other communicable disease facilitated by high-risk sexual conduct, should as public policy be regulated and standards for the prevention of the spread of these communicable diseases should be established for the protection of the public health, safety and welfare.
 
 
 83
 Id. (emphasis added). The Synopsis accompanying Senate Bill No. 164 provides:
 
 
 84
 Magazine and newspaper articles, from time to time, contain articles relating to "anonymous sex" which takes place within certain adult entertainment establishments or similar places. It is the basic premise of this Act that such conduct is conducive to the spread of communicable disease; and is not only a danger to persons frequenting the adult entertainment establishment, or those engaged in such conduct, but it is also of danger to the pubic [public]....
 
 
 85
 Mitchell II, 802 F.Supp. at 1116.
 
 
 86
 As it did with the closing-hours restriction, Adult Books asserts that the factual record does not show the Delaware General Assembly passed the open-booth amendment for the purpose it set forth. It points to the record of the proceedings on the floor of the Delaware House of Representatives on final passage of the open-booth amendment. A review of this record reveals a reading of the bill by title and a brief oral description of its purpose by the sponsoring member immediately preceding the vote. In the Senate before enactment, Senator McBride, the sponsoring senator, informed the Senate from the floor:
 
 
 87
 This is a very serious piece of legislation for a number of reasons. And we did a lot of research with it and got a lot of help in developing the legislation and there has been some question in the past in other states about whether or not an open booth law ... is constitutional and we have found through research that that has been upheld in federal courts.
 
 
 88
 Id. (emphasis omitted).
 
 
 89
 Too close a concentration on the proceedings in the General Assembly on final passage would improperly overlook other evidence that the Delaware General Assembly had a proper purpose for passing the open-booth amendment. On two separate occasions the General Assembly heard testimony from Captain Hancock of the Delaware State Police. The minutes of the House Sunset and Overview Committee for June 27, 1991 show that Captain Hancock testified on behalf of Senate Bill No. 164, the open-booth amendment, and "provided graphic descriptions of the behavior which the bill hopes to control." App. at 305. Captain Hancock also addressed the full Senate on June 19, 1991, after Senator McBride introduced the bill, when a senator asked for further explanation of the purposes of the bill. Captain Hancock explained that as head of the Delaware State Police's Financial Crime and Organized Crime Unit he had many contacts with adult entertainment establishments statewide. He described the booths commonly used and said that it was police experience "that the booths are little more than masturbation booths" and that seminal fluid was commonly found dripping down the walls and on the floor in puddles. App. at 316-18. Senator McBride then added that the legislation was intended to stop the spread of sexually related diseases and that similar legislation in other jurisdictions had been upheld.
 
 
 90
 In Postscript Enterprises, the United States Court of Appeals for the Eighth Circuit upheld an open-booth requirement for a movie arcade on the theory of "legislative notice" adopted by the United States Court of Appeals for the Fourth Circuit in Wall Distributors. Postscript Enter., 905 F.2d at 226-27 (quoting Wall Distrib., 782 F.2d at 1169-70 n. 7).[20] The court of appeals upheld the open-booth ordinance based solely upon the purpose and need for an open-booth requirement that was stated in the enactment's introductory clauses. Id. at 227; cf. Christy v. City of Ann Arbor, 824 F.2d 489, 493 (6th Cir.1987) (insufficient factual support because there was no evidence of need and purpose, not even a preamble or statement in the regulation itself), cert. denied, 484 U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988).
 
 
 91
 The introductory clause of the Postscript Enterprises ordinance stated: "the City Council finds that the viewing of movies within closed booths tends to promote crime, unsanitary conditions, and a pattern of conduct inimical to public health, decency and order." Postscript Enter., 905 F.2d at 228. There was no other factual support in Postscript 's record. The Postscript court, in upholding an open-booth amendment on the basis of this clause, also recognized that other courts which had considered the validity of ordinances combating the dangers posed by closed viewing booths have uniformly upheld them as valid place or manner restrictions on protected speech. Id. at 227 (citations omitted).
 
 
 92
 Indeed, Adult Books acknowledges that all federal courts that have addressed this issue have unanimously upheld the open-booth requirement as a valid exercise of state police power. See, e.g., Bamon Corp. v. City of Dayton, 923 F.2d 470 (6th Cir.1991); Doe v. City of Minneapolis, 898 F.2d 612 (8th Cir.1990); Postscript Enter., 905 F.2d 223; Berg v. Health & Hospital Corp of Marion County, 865 F.2d 797 (7th Cir.1989); FW/PBS, Inc. v. City of Dallas, 837 F.2d 1298 (5th Cir.1988), vacated in part on other grounds, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); Wall Distrib., 782 F.2d 1165; Ellwest Stereo Theatres, 681 F.2d 1243; Grunberg v. Town of East Hartford, Connecticut, 736 F.Supp. 430 (D.Conn.1989), aff'd, 901 F.2d 297 (2d Cir.1990) (per curiam); Movie & Video World, 723 F.Supp. 695; Suburban Video, Inc. v. City of Delafield, 694 F.Supp. 585 (E.D.Wis.1988); Broadway Books, Inc. v. Roberts, 642 F.Supp. 486 (E.D.Tenn.1986).
 
 
 93
 Adult Books contends that these cases are distinguishable. It points out that in each of them, with the exception of the Court of Appeals for the Eighth Circuit's decision in Postscript Enterprises, factual support of a proper need and purpose for the prohibition on closed booths was stronger than that which is present in this case. We are unpersuaded. This record shows that the open-booth amendment was not enacted out of a mere unsupported legislative preference for the open booths or because the legislature arbitrarily and irrationally believed that closed booths contribute to a serious public health problem. Instead, the record shows that the concerns expressed in the preamble to the open-booth amendment when the Delaware House and Senate were considering its passage are not arbitrary, irrational or speculative and that the predominate motivating factor that led the Delaware legislature to pass the open-booth amendment was the reduction of these adverse incidental effects. The Delaware General Assembly had a legislatively adequate basis to support enactment of the open-booth amendment. It is not up to this Court to question the wisdom of its decision.
 
 2. Narrowly Tailored Requirement
 
 94
 Although we have determined there is sufficient factual support to justify the government's asserted interest and purpose, we must determine whether the open-booth requirement is narrowly tailored to serve the governmental objective of preventing the spread of AIDS and other sexually transmitted diseases. Adult Books' argument that there are better means to deter sexual contact in the booths without inhibiting freedom of expression is rejected for much the same reasons that we rejected its similar argument against the closing-hours amendment. The choice of one among several legitimate statutory means to obtain a legitimate end is a matter for the legislature not the judiciary. Moreover, it does not appear that use of partial doors open only at the bottom, booths spaced further apart, or booths with the bottom two feet of the door removed would adequately accomplish the legislative goal of deterring promiscuous sexual contacts that can spread deadly disease. Doors of this kind would not inhibit sexual activity between two individuals in adjacent booths through the use of holes in the common dividing partitions, or inhibit masturbation within the partially enclosed booths.[21] Therefore, we reject Adult Books' contention that the legislative purpose of preventing unprotected sexual activity arguably could be served by spacing the booths one foot apart as well as its suggestion that this spacing, combined with partial doors, would reduce undesirable sexual conduct within the booths with less impairment of the privacy that encourages persons using the booths to engage in the kind of expressive activity Adult Books seeks to promote. Moreover, Delaware did not have to adopt the means Adult Books preferred to regulate the undesirable health effect of the marginally protected speech and expression it purveys. The state must be allowed a reasonable opportunity to experiment with solutions to problems, Renton, 475 U.S. at 52, 106 S.Ct. at 931 (quoting Young, 427 U.S. at 71, 96 S.Ct. at 2452), and the regulation "need not be the least-restrictive or least-intrusive means of doing so." Ward, 491 U.S. at 798, 109 S.Ct. at 2757-58 (footnote omitted); see also Bamon Corp., 923 F.2d at 473-74. But see Berg, 865 F.2d at 803-04 (requiring least restrictive means analysis but concluding it was easily met with open-booth ordinance). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800, 109 S.Ct. at 2758.
 
 
 95
 Thus, Delaware's officers and the Commissioners did not have to show that "[t]he open booth regulation appears to be the least burdensome means of controlling offensive and illegal activity within the booths that can be imagined." Wall Distrib., 782 F.2d at 1170. The Delaware patrons of establishments like Adult Books may still view what they desire privately in their homes or publicly in places that provide the material they seek. Therefore, we hold the open-booth amendment is narrowly tailored under the standards Ward and Young instruct us to apply to non-content based restrictions on the manner and place for the distribution of speech-related materials.[22]
 
 C. Alternative Channels of Communication
 
 96
 The open-booth amendment leaves ample alternative channels of communication. Nothing in it limits the number of viewing booths or the type of material that can be shown within the booths. Because the statute does not bar people from entertaining themselves by viewing sexually explicit films within individual booths or from renting, purchasing, or privately displaying any film or video, the availability of films or other entertainment to the public is not significantly impaired. So long as this is so, the amendment's effect on Adult Books' revenues from the purchase of the tokens needed to gain access to the booth is not material to a First Amendment analysis. See Young, 427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring); Movie & Video World, 723 F.Supp. at 700. "The viewing public is in no way 'denied access to the market ... or ... unable to satisfy its appetite for sexually explicit fanfare.' " Berg, 865 F.2d at 803 (quoting Young, 427 U.S. at 62, 96 S.Ct. at 2448).
 
 VI.
 
 97
 For the foregoing reasons the order of the district court granting summary judgment in favor of the Commission in No. 92-7508 will be affirmed.
 
 
 
 [1]
 "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I. This amendment is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)
 
 
 [2]
 Adult Books' related appeal docketed at our No. 92-7507 from the district court's denial of costs and fees against the Commission under 42 U.S.C.A. Sec. 1988 (West Supp.1993), had been consolidated with this appeal for oral argument. The motion for counsel fees was based on a claim of partial success. It will be decided in a separate opinion
 
 
 [3]
 Reported cases show several counties, cities and localities have adopted ordinances or provisions similar to the closing-hours and open-booth requirements involved in this case; however, none of them involved restrictions a state legislature prescribed for state-wide application. See, e.g., Doe v. City of Minneapolis, 898 F.2d 612 (8th Cir.1990); Berg v. Health & Hosp. Corp., 865 F.2d 797 (7th Cir.1989); Star Satellite, Inc. v. City of Biloxi, 779 F.2d 1074 (5th Cir.1986)
 
 
 [4]
 The Commission does not contend that the materials sold and viewed in adult entertainment establishments are obscene or that their content is undeserving of any First Amendment protection
 
 
 [5]
 Voltaire, referring to a suggestion that the violent overthrow of tyranny might be legitimate, said: "I disapprove of what you say, but I will defend to the death your right to say it." Young v. American Mini Theatres, Inc., 427 U.S. 50, 63 & n. 19, 96 S.Ct. 2440, 2449 & n. 19, 49 L.Ed.2d 310 (1976) (citing S. Tallentrye, The Friends of Voltaire 199 (1907))
 
 
 [6]
 Supreme Court jurisprudence uses "substantial" and "significant" interchangeably to describe the governmental interest at stake. Compare Renton, 475 U.S. at 47-48, 106 S.Ct. at 928-29 ("substantial") with Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) ("significant")
 
 
 [7]
 More recently, in Barnes, the Supreme Court indicated that the applicable analysis for evaluating restrictions on nude dancing is the analysis formulated in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See Barnes, --- U.S. at ----, 111 S.Ct. at 2460. The O'Brien Court established a four-prong test to be applied in determining whether a government regulation of conduct violated the First Amendment. This test considers whether the regulation is
 within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 O'Brien, 391 U.S. at 376-77, 88 S.Ct. at 1679. In adopting this analysis in Barnes, the Supreme Court indicated that it parallels the analysis applied in Renton. See Barnes, --- U.S. at ----, 111 S.Ct. at 2460. Courts which have considered the constitutionality of open-booth ordinances have applied both O'Brien and Renton, indicating that the outcome is the same regardless of which analytical framework is applied. See, e.g., 11126 Baltimore Blvd. v. Prince George's Cty., Md., 886 F.2d 1415, 1420-21 (4th Cir.1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990); Movie & Video World, Inc. v. Board of Cty. Comm'rs, 723 F.Supp. 695, 698-701 (S.D.Fla.1989) (considering both O'Brien and Renton analyses and concluding that "the result under either of these tests is the same"). We agree with the Movie & Video World, Inc. court that regardless of whether the analytical framework of O'Brien or Renton is applied to the case at hand, that the result would be the same. Furthermore, the parties concede Renton's applicability. See Brief for Appellants at 33-35; Brief for Appellees at 22-23. Therefore we will analyze the case under Renton.
 
 
 [8]
 Courts have sustained regulatory restrictions on the hours of operation for many businesses; but most of these cases applied the deferential rational basis test because no fundamental right was involved. See, e.g., Cash Inn of Dade, Inc. v. Metropolitan Dade County, 938 F.2d 1239, 1241 (11th Cir.1991) (upholding under rational basis test ordinance limiting hours of operation of pawnshops to 7:00 a.m. to 5:00 p.m., seven days a week); Pollard v. Cockrell, 578 F.2d 1002, 1014 (5th Cir.1978) (upholding ordinance regulating hours of massage parlors); Patch Enter., Inc. v. McCall, 447 F.Supp. 1075, 1082 (D.Fla.1978) (upholding regulation on hours of bars). The closing-hours restriction in the case before us must be given heightened First Amendment scrutiny
 
 
 [9]
 The challenged ordinance in Renton "provide[d] that such theatres may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school." Renton, 475 U.S. at 46, 106 S.Ct. at 928
 
 
 [10]
 Adult Books also contends that the closing-hours requirement abridges its First Amendment freedom of expression because it is busiest after 10:00 p.m. on weekdays and Saturdays, and on Sundays and holidays. It goes on to argue that enforcement of the closing-hours amendment has caused it to lose a tremendous amount of business. The Supreme Court, however, has stated that "[t]he inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression." Young, 427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring); see also Movie & Video World, 723 F.Supp. at 700 (First Amendment does not guarantee anyone a profit; all it requires is that speech, expression, and ideas be allowed an adequate forum). Adult Books has not attempted to show that it is not possible for adult entertainment centers to comply with the restriction on business hours and survive economically
 
 
 [11]
 Legislative bodies, in enacting statutes, do not receive evidence or take sworn testimony in the manner of courts. Legislative committees sometimes conduct hearings on pending bills, but the testimony they take is often unsworn and the documents they receive unauthenticated. The principles embodied in bills on the floor of a legislative body are generally debated more or less in accord with principles of logic and rhetoric, not proven through the admission of evidence. In Delaware it appears, however, that testimony can also be given when a Bill is on the floor. The judgment of the members of Delaware's General Assembly, like that of other legislators, is exercised on the basis of their personal experience and the experience of their constituents; their judgment is not limited by the record presented to the assembled body
 
 
 [12]
 Proceedings of the Delaware Senate and House are tape recorded
 
 
 [13]
 There is no evidence on this record that Senator McBride's purpose, as sponsor of Senate Bill No. 163, was anything other than what he stated or that he was unfamiliar with the facts the state police had presented to him. Likewise, we do not suppose Adult Books would have us infer without evidence that the statements a member of a legislative body makes on the floor about the purpose and effect of pending legislation are untrustworthy. Such a presumption would seem unworkable as a matter of parliamentary procedure and could serve to invalidate every enactment that must constitutionally have the support of a substantial or significant governmental interest
 
 
 [14]
 The district court relied upon the post-enactment depositions of two of the Commissioners as supplemental evidence. This evidence speaks to both Renton's requirements that incidental restrictions on speech must be justified by a substantial governmental interest and that the government interest must be the predominate purpose for passage
 
 
 [15]
 The city zoning ordinance in Star Satellite also restricted the location and operation of adult bookstores, massage parlors, bars, nightclubs and pool halls that serve liquor. Star Satellite, 779 F.2d at 1077 & n. 2
 
 
 [16]
 The United States Court of Appeals for the Fifth Circuit noted that the Star Satellite ordinance restricting the operation of regulated businesses to fourteen hours a day six days a week did not suppress all sexually-explicit speech within the city, and so distinguished it from the ordinances in Schad v. Borough of Mount Ephraim, 452 U.S. 61, 63, 101 S.Ct. 2176, 2179-80, 68 L.Ed.2d 671 (1981). Star Satellite, 779 F.2d at 1079-80; see also Broadway Books, Inc. v. Roberts, 642 F.Supp. 486, 493, 504 (E.D.Tenn.1986) (upholding hours of operation provision requiring adult-oriented establishments to remain closed between 3:00 a.m. and 8:00 a.m. on weekdays and between 3:00 a.m. and 12:00 noon on Sundays); Ellwest Stereo Theater, Inc. v. Boner, 718 F.Supp. 1553, 1577 (M.D.Tenn.1989) (same)
 
 
 [17]
 See Renton, 475 U.S. at 48, 106 S.Ct. at 929; see also Bamon Corp. v. City of Dayton, 923 F.2d 470, 473 (6th Cir.1991) ("Regulations that apply to a particular category of speech because the regulatory targets happen to be associated with that type of speech are properly characterized as content-neutral, as long as the regulations are justified without reference to the content of that speech.") (citing Boos v. Barry, 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988))
 
 
 [18]
 While the effect of the Bill on the class of persons it affects is often a subject of legislative debate, the debate is not normally focussed on the Bill's effect on a particular person
 
 
 [19]
 Adult Books' argument that its particular location eliminates many of the undesirable effects the legislature wanted to regulate also overlooks the location of the Midvale residential development directly across the street on the southbound side of the highway where the residents are not immune to the nuisance of night noise and disturbances. In addition, there is evidence that patrons are known to park in the residential area and walk to the book store so that their cars would not be recognized at the book store
 
 
 [20]
 See supra Part IV. B. 1. for our previous discussion of Postscript and the adequacy of the legislative record in support of the closing-hours amendment. The record of pre-enactment evidence in support of the need for and purpose of the open-booth amendment is stronger than that which we held sufficient to support the closing-hours amendment. Therefore, it is again unnecessary for us to rely on an unlimited doctrine of legislative notice
 
 
 [21]
 See Wall Distrib., 782 F.2d at 1169 (recognizing prevention of masturbation within booths and the unsanitary conditions that result as substantial government interest justifying closed booth ordinance); Movie & Video World, 723 F.Supp. at 699 (recognizing possibility that AIDS and other diseases could be spread by masturbation or by ejaculated semen left exposed on interior of booths). But see Suburban Video, 694 F.Supp. at 590 ("[W]hile AIDS apparently cannot be spread by masturbation, or by semen on the walls or floors of booths, [the State] has a substantial ... interest in ensuring sanitary, not just safe, public places."). Furthermore, a partial door would not necessarily prohibit an individual from engaging in sexual intercourse with others in the same booth because he could simply hold his or her partner so that his or her legs would not be exposed
 
 
 [22]
 We also reject Adult Books' argument that the two amendments violated the Equal Protection Clause of the Fourteenth Amendment. The United States Supreme Court has held that states and local governments may regulate adult entertainment establishments differently than other business establishments if the regulation is content-neutral and aimed at ameliorating secondary effects caused by such establishments. See Young, 427 U.S. at 70-71, 96 S.Ct. at 2452 ("[T]he State may legitimately use the content of these [motion pictures] as the basis for placing them in a different classification from other motion pictures."); see also Renton, 475 U.S. at 49-50, 106 S.Ct. at 929-30; Star Satellite, 779 F.2d at 1080. We do not address Adult Books' argument that the open-booth provision is unduly vague. Although it was raised in the district court, Adult Books did not brief it on appeal and it is therefore waived or abandoned. See Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1011 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991)